

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-22-1994

# Fison Horticulture, Inc. v. Vigoro Industries, Inc.

Precedential or Non-Precedential:

Docket 93-7224

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Fison Horticulture, Inc. v. Vigoro Industries, Inc." (1994). *1994 Decisions.* Paper 93.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/93

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 93-7224 & 93-7287
_____


FISONS HORTICULTURE, INC.,
                    Appellant in No. 93-7224

                    v.

VIGORO INDUSTRIES, INC.,
                    Appellant in No. 93-7287


_____

On Appeal from the United States District Court
        for the District of Delaware
    (D.C. Civil Action No. 92-00066)
        _____


Argued January 20, 1994

Before:  SCIRICA, LEWIS and GARTH, Circuit Judges

(Filed July 22, 1994)


            JACK R. PIROZZOLO, ESQUIRE (Argued)
            Willcox, Pirozzolo & McCarthy
            50 Federal Street
            Boston, Massachusetts 02110

            DONALD F. PARSONS, JR., ESQUIRE
            Morris, Nichols, Arsht & Tunnell
            1201 North Market Street
            P.O. Box 1347
            Wilmington, Delaware 19899

               Attorneys for Appellant/Cross-Appellee
               Fisons Horticulture, Inc.


1

BYRON L. GREGORY, ESQUIRE (Argued)
MICHELLE C. BURKE, ESQUIRE
McDermott, Will & Emery
227 West Monroe Street
Chicago, Illinois 60606

Attorneys for Appellee/Cross-Appellant
Vigoro Industries, Inc.

---

OPINION OF THE COURT

---

SCIRICA, <u>Circuit</u> <u>Judge</u>.

This is a trademark infringement case concerning products in the home lawn and garden market. The owner of the trademark "Fairway" for peat moss alleges another company infringed its right to the mark and competed unfairly by selling fertilizer under the name "Fairway Green."

Fisons Horticulture, Inc. ("Fisons"), a Canadian corporation with its principal place of business in Bellvue, Washington, brought this suit against Vigoro Industries, Inc., ("Vigoro"), a Delaware corporation with its principal place of business in Fairview Heights, Illinois. Fisons, which markets peat moss under the registered trademark "Fairway", claims Vigoro's use of the brand name "Fairway Green" for fertilizer constitutes trademark infringement[0] and unfair competition[0] under

---

[0] Section 32 of the Lanham Act, 15 U.S.C. § 1114 (1988 & Supp. IV 1992) protects registered trademarks and provides in part:

> (1) Any person who shall, without the consent of the registrant --
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark

2

the Lanham Act, 15 U.S.C. §§ 1051-1127 (1988 and Supp. IV 1992), infringement of a common law trademark, common law unfair competition, and violates the Delaware Deceptive Trade Practices Act, Del. Code Ann. tit. 6, §§ 2531-33 (1993).

After a bench trial, the district court entered judgment for Vigoro on Fisons' claims and for Fisons on Vigoro's cross-claim for attorneys' fees under 15 U.S.C. § 1114(1), as provided by 15 U.S.C. § 1117.  Both parties appealed.  For reasons that follow, we will reverse the district court's judgment for Vigoro on Fisons' Lanham Act claims, affirm its

---

> in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, . . .
> . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

[0]Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (1988 & Supp. IV 1992), which provides protection for both registered and unregistered marks, states in part:

> (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
> > . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

3

judgment for Fisons on attorneys' fees, and remand for a new trial.

I.

A. <u>Fisons Horticulture, Inc. and Fairway Peat Moss</u>

Fisons is a subsidiary of a British-owned company, Fisons, PLC, which has three divisions: pharmaceuticals, scientific equipment, and horticultural products. Its horticulture division has companies in the United Kingdom, France, and the Benelux Countries, as well as in North America.

Fisons markets Canadian sphagnum peat moss, a natural organic product used to improve soil texture and protect plants from temperature extremes, under the registered trademark "Fairway" in the United States. Fisons acquired the Fairway trademark in 1980 from the original owner, Western Peat Company, Ltd., which first used the trade name in 1959 and registered it in 1960.

Fairway is not the only name under which Fisons sells peat moss; it also uses the names "Sunshine" and "Parkland." Sunshine and Parkland together account for over 95% of its sales in the United States and Fairway accounts for the remainder.[0] Fisons' three brands of peat moss account for about 25% of the U.S. peat moss market. From 1987 through 1991, Fisons sold over

---

[0] It is not uncommon for one business to use multiple brand names for what is essentially the same product; the use of different brand names allows Fisons to sell peat moss to a lawn and garden store under a brand name not sold by a nearby competing discount outlet.

4

$500,000 of Fairway peat moss each year.  Fisons sells Fairway peat moss primarily to homeowners for lawn and garden care through the traditional channels -- lawn and garden stores, hardware stores, home improvement centers, supermarkets, drug stores, and discount stores.  Fisons does not advertise Fairway peat moss directly to consumers.  Instead, it promotes its product to retailers, makes advertising copy available to them, and reimburses them for their advertising expenses.[0]

Besides selling peat moss, Fisons sells to the U.S. greenhouse market potting mixes; analyses of soil, water and tissue samples; and professional fertilizer.  It also offers an extensive line of lawn and garden products in Canada.  Fisons has been considering expanding its product line in the United States by acquiring regional fertilizer brands and unifying them as a national brand for the consumer fertilizer market.  One of the proposed trademarks for the national fertilizer brand is Fairway.

Fairway peat moss is sold in a white plastic bag with the mark "Fairway" in large script in green letters above the words "peat moss" in block red letters.  The bag has a central design of a golf course green surrounded by roses.  A pin with a red triangular flag appears in the center of the green, and the word "sphagnum" is printed in white on the flag.  On the back of the package, recommended uses are listed as "preparing new lawns," "top dressing old lawns," and "garden soil mix or mulch."

---

[0]But in 1990, a year in which Fisons had retail sales of Fairway peat moss in 17 states for a total of $684,316, only one retailer published an advertisement for Fairway; it sought reimbursement for $1,232.57.

The package notes that peat moss is used with fertilizer and that it "saves fertilizer".

B.  Vigoro Industries, Inc. and Fairway Green Fertilizer

Vigoro Industries has been in the fertilizer business in the United States since 1890, and the Vigoro name has been used on products since 1924.  It is a prominent name in the industry and it plans to compete with the market leader, O.M. Scott & Sons Co., across the full range of Scott products. Vigoro sells its products to consumers through garden centers, discount stores, hardware stores, seed and feed stores, home improvement centers and supermarkets and drug stores.

Before 1991, Vigoro offered standard quality fertilizer to consumers, but in 1991, it decided to offer to the upscale consumer market a new line of premium-quality fertilizers, containing the patented slow-release nitrogen ingredient it used in its premium golf course fertilizer.  Vigoro hired an advertising agency to help select a name and promotional program for the new product.  After a search disclosed that many proposed names were registered as trademarks by other companies, the agency recommended "Fairway Green."[0]

---

[0]One of the names explored for Vigoro's new line of fertilizers was "Golf Course Green," but the advertising agency's trademark attorney found that a subsidiary of Sandoz Pharmaceutical Corporation owned the named "Golf" for fertilizers and herbicides.  The trademark appeared to be inactive, so Vigoro requested a royalty-free license to use "Golf Course Green." When it was refused, Vigoro decided not to use the name.  Vigoro made no similar request of Fisons or any other owners of a "Fairway" trademark.

The agency's trademark counsel stated in her recommendation that "Fairway" was registered as a trademark by several companies:

> As we discussed, there is a possibility that one or more of the owners of "fairway" marks might contest Vigoro's right to use FAIRWAY GREEN. However, since there is no history of any of the prior users opposing each other's uses of "fairway," the risk should be acceptabl[y] low.
>
> There is also a risk that the application will be assigned to an examiner who will take a strict position and site [sic] one or more of the prior "fairway" registrations as grounds for refusing to register your mark. Because so many "fairway" marks have been registered in the past I believe this risk is also low.

Fisons Horticulture, Inc., v. Vigoro Indus., No. 92-66, slip op. at 3 (D. Del. Mar. 3, 1993).

There were several other registrations and applications including the word "Fairway," but few of them were in the same trademark category as Fisons' Fairway, that is, U.S. class 10, "Fertilizers." In that class, Western Peat, Fisons' predecessor, had registered "Fairway" for peat moss in 1960 and O.M. Scott had registered "Super Fairway" for agricultural and horticultural fertilizers in 1988. O. M. Scott marketed Super Fairway for commercial but not consumer use. After Vigoro applied for registration of "Fairway Green" for its fertilizers in May, 1991, Fisons contested both that application and O. M. Scott's prior registration and applied for its own registration of "Fairway" for fertilizer.

7

In addition to these trademark registrations and applications in U.S. trademark class 10, approximately six companies had registered or were trying to register "Fairway" for one or more other products and services related to lawns and gardens: grass seed, lawn and garden machinery and equipment, and lawn services; but only three such registrations were completed and active at the time the survey was made. Others were pending or had been abandoned. Finally, there were unregistered uses of the name "Fairway" for goods and services relating to lawns and gardens, as shown by surveys of telephone books.

In May, 1991, Vigoro decided on the Fairway Green name. It filed its trademark application on May 20, 1991 and introduced the new product line at the National Hardware Show in August, 1991. The Hardware Show was the first notice Fisons had of Vigoro's use of the name "Fairway Green." By June, 1992, Vigoro had spent over $500,000 on advertising and promotion and had sold approximately $1.3 million of Fairway Green products in 33 states. Fisons protested Vigoro's attempt to register the trademark on September 26, 1991 and filed a suit in Delaware Chancery Court on January 10, 1992; Vigoro removed it to United States District Court.

Fairway Green fertilizer is sold in a heavy paper bag. The background color of the bag is green, red, purple or magenta, depending on which of four varieties of the fertilizer it contains. On the front of the bag is a large yellow rectangle that has in white on purple the words "Vigoro" at the top and "Premium Lawn Fertilizer" just below the middle. Between these

8

two, in larger green letters with yellow highlighting borders, are the words "Fairway Green."  The word "Fairway" arches over the word "Green," and in the arch is a golf course green containing a golf ball, cup, and a pin with a red triangular flag.  Behind the golf course green is a yellow setting sun with blue rays.  On the package is the statement:  "Keeps grass green longer with fewer clippings when compared with soluble fertilizers.  Contains the controlled-release nitrogen used on 70 of America's top 100 golf courses.  Environmentally-oriented, formulated without nitrates."

C.  Purchase and Use of the Products

Fairway peat moss and Fairway Green fertilizer occupy the same segment of the lawn and garden products market, the "fertilizer/soil conditioner" segment.  They are frequently used together to prepare the soil for planting, but the use of peat moss may cut down on the use of fertilizer, as noted on the Fairway peat moss package.  The two products are both low-cost items,[0] and there was testimony that consumers who use these products typically spend very little time deciding which product to buy.  Peat moss and lawn and garden fertilizers are often displayed in the same area of stores, and both target homeowners who do their own lawn and garden work.  A number of other companies selling lawn and garden products, including the market

---

[0]A 4 cubic foot bag of Fairway peat moss has a retail price of approximately $8.00 - $15.00; a 20-25 pound bag of Fairway Green fertilizer has a retail price of approximately $8.00 - $15.00, with discounts and rebates.

9

leader, O.M. Scott, sell both peat moss and fertilizer; Vigoro sells bark mulch as well as fertilizer.

## II.

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion."  Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir. 1983); see, Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291-93 (3d Cir.), cert. denied, 112 S.Ct. 373 (1991), and authorities cited therein; Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228-29 (3d Cir. 1978).  To prove trademark infringement, a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.  Ford Motor Co., 930 F.2d at 291 (citing Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 192 (3d Cir. 1990)).

The first two requirements, validity and legal protectability, are proven where, as here, a mark was federally registered and has become "incontestible" under the Lanham Act, 15 U.S.C. §§ 1058 and 1065.[0]  Ford Motor Co., 930 F.2d at 291 (citing Opticians Ass'n, 920 F.2d at 194).  If the mark has not

---

[0]A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration.

10

been federally registered or, if registered, has not achieved incontestability, validity depends on proof of secondary meaning, unless the unregistered mark is inherently distinctive. Ford Motor Co., 930 F.2d at 291 (citing A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir. 1986)). The mark in this case is both registered and incontestible.

A plaintiff must also prove the third requirement, the likelihood of confusion, which exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Dranoff-Perlstein Assoc. v. Sklar, 967 F.2d 852, 862 (3d Cir. 1992) (internal quotations omitted). "Proof of actual confusion is not necessary; likelihood of confusion is all that need be shown." Ford Motor Co., 930 F.2d at 292 (internal citations omitted).[0] The showing of proof plaintiff must make for this requirement depends on whether the goods or services offered by the trademark

---

[0] Some actions brought under the Lanham Act require proof of actual confusion and others do not. In an action brought under sections 32 and 43(a) of the Lanham Act for trademark infringement, 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A), plaintiff need not provide proof of actual confusion; he need only show likelihood of confusion. Ford Motor Co., 930 F.2d at 292. In an action brought under another part of section 43(a) of the Lanham Act for false advertising, 15 U.S.C. § 1125(a)(1)(B), plaintiff need not prove the challenged advertising misled the public if he can show it was literally false. However, if his claim is not that the advertising was false but that it was misleading, he must prove the public was actually misled or confused by it. Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, 19 F.3d 125, 129-30 (3d Cir. 1994); Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 228-29 (3d Cir. 1990).

11

owner and the alleged infringer are in direct competition. "Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." Lapp, 721 F.2d at 462 (citations omitted). The court focuses on the marks to determine whether they are "confusingly similar." Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1063 (3d Cir. 1991). Where the goods or services are not competing, the similarity of the marks is only one of a number of factors the court must examine to determine likelihood of confusion.

> To determine likelihood of confusion where the plaintiff and defendant deal in non-competing goods or services, the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold. The closer the relationship between the products, and the more similar their sales contexts, the greater the likelihood of confusion. Once a trademark owner demonstrates the likelihood of confusion, it is entitled to injunctive relief.

Lapp, 721 F.2d at 462 (citations omitted).

Likelihood of confusion is also the test for actions brought under section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) for unfair competition to prevent false representations as to the source or origin of goods or services by a mark confusingly similar to one already in use. See, e.g., Sun-Fun Products, Inc. v. Suntan Research & Development Inc., 656 F.2d 186, 192 (5th Cir. Unit A Sept. 1981) (factors relevant to unfair competition claim under 15 U.S.C. § 1125 "essentially the same" as those relevant to trademark infringement claim under 15 U.S.C. § 1114).

12

A.   Likelihood of Confusion Under the Lanham Act.

We have adopted a ten-factor test to determine likelihood of confusion in the market place as to a product's source in cases of alleged trademark infringement and unfair competition by a producer of a non-competing product.  Dranoff-Perlstein, 967 F.2d at 862-63 (3d Cir. 1992); Ford Motor Co., 930 F.2d at 293;  Lapp, 721 F.2d at 463; Scott Paper, 589 F.2d at 1229.  They are:

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

13

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

In Lapp, we applied these factors to decide an issue of trademark protection where two parties used the same trademark on non-competing products. The Lapp Division of plaintiff Interpace Corporation ("Lapp-Interpace") made and sold ceramic insulators under the "Lapp" trademark. The trademark was registered in 1953. Defendant, Lapp, Inc., the U.S. marketing arm of a German corporation, had distributed wire, cable and related electrical hardware in the U.S. under the names "Lapp" and "Lapp Cable" since 1977 but had never applied for federal registration of its mark. Lapp-Interpace sued under the Lanham Act to enjoin Lapp, Inc., from using the "Lapp" name on its products. The district court had dismissed the complaint because of its reading of Scott Paper. We reversed, holding that Scott Paper mandated judgment for the plaintiff. Lapp, 721 F.2d at 462.

The district court made factual findings in every relevant area of inquiry, but it did not formally apply the Scott Paper factors. Lapp, 721 F.2d at 463. We applied them and found they weighed in favor of the plaintiff. While the parties' sales efforts at that time were not directed to the same targets, there was evidence that they would likely clash in the future; defendant, which had previously sold wire and cable for use in electrical components shipped to Europe and conforming to European specifications, had begun to manufacture wire and cable

14

that met United Stated specifications.  We noted "[t]his development considerably increase[d] the overlap in the parties' actual and potential customer pool," id. at 464, and determined plaintiff's ceramic insulators and defendant's wire and cable were closely related functionally.  Both were basic electrical components and were often used together.

We concluded customers would find it natural for the manufacturer of Lapp ceramic insulators and pole hardware to expand into wire and cable, and Lapp-Interpace introduced evidence it planned to do just that.  We noted:

> The likelihood-of-expansion factor is pivotal in non-competing products cases such as this.  One of the chief reasons for granting a trademark owner protection in a market not his own is to protect his right someday to enter that market.  When it appears extremely likely, as it does here, that the trademark owner will soon enter the defendant's field, this final factor weighs heavily in favor of injunctive relief.

Id. (citation omitted).  We noted the purpose of the ten-factor analysis was to determine likelihood of confusion in those cases where the trademark owner had not yet entered the defendant's market.  The factors are of importance here, where the markets for peat moss and fertilizer overlap slightly, but are not in direct competition.  The two products are often used together.  Fisons has not yet entered the consumer fertilizer market, but claims it has plans to do so and introduced evidence to that effect.

B.  Reverse Confusion

15

Plaintiffs under the Lanham Act also rely on "reverse confusion" or "dilution" of trademark theories that have been adopted by a number of other courts of appeal.[0] Ordinarily, one expects that the new or junior user of the mark will use to its advantage the reputation and good will of the senior user by adopting a similar or identical mark. Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947 (7th Cir. 1992) (Quaker Oats Co.'s use of "Thirst-Aid" in advertising for Gatorade was trademark infringement of "Thirst-Aid" registered trademark owned and formerly used by small Vermont company); Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486 (2d Cir. 1988) (marketer of women's clothing with unregistered trademark "Bee Wear" could enjoin Bloomingdales from using term "B-Wear" in its stores and on its clothes); Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960 (6th Cir. 1987) (use by defendant holding company for five midwestern Bell telephone companies of unregistered trade name and mark of plaintiff, a small Ohio corporation that reclaimed industrial oils, might cause consumers to assume plaintiff was subsidiary of defendant); Capital Films Corp. v. Charles Fries Productions, Inc., 628 F.2d 387 (5th Cir. 1980)

---

[0] While we have not previously adopted these theories, in Lapp, we spoke of protecting the market for expansion by a senior user of a trademark, one of the considerations in reverse confusion. See Lapp, 721 F.2d at 464.

16

(reverse confusion doctrine could be applied where defendants, including American Broadcasting Company, planned to produce movie on Lee Harvey Oswald bearing same title as movie produced by small production company); Big O Tire Dealers, Inc., v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir. 1977) (reverse confusion occurs where "infringer's use of plaintiff's mark results in confusion as to origin of plaintiff's product").  In reverse confusion,

>the junior user saturates the market with a similar trademark and overwhelms the senior user.  The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter.  The result is that the senior user loses the value of the trademark -- its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

Ameritech, 811 F.2d at 964.

Without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks.

>The logical consequence of [failing to recognize reverse confusion] would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor.  If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop a new meaning for that trademark as identification of the second user's products.

17

<u>Big O Tire Dealers</u>, 561 F.2d at 1372 (quoting <u>Big O Tire Dealers</u> <u>v. Goodyear Tire & Rubber Co.</u>, 408 F. Supp. 1219, 1236 (D. Colo. 1976)).

Although we have not yet adopted the doctrine of reverse confusion in a trademark case, we do so here and endorse the statement of the United States Court of Appeals for the Second Circuit:

> The objectives of [the Lanham] Act -- to protect an owner's interest in its trademark by keeping the public free from confusion as to the source of goods and ensuring fair competition -- are as important in a case of reverse confusion as in typical trademark infringement. Were reverse confusion not a sufficient basis to obtain Lanham Act protection, a larger company could with impunity infringe the senior mark of a smaller one. Consequently, we hold that reverse confusion . . . is actionable under §43(a) of the Lanham Act.

<u>Banff</u>, 841 F.2d at 490-91 (citation omitted).


III.

On appeal, Fisons contends the district court misapplied the relevant law in finding there was little likelihood of confusion.[0] We have jurisdiction under 28 U.S.C. § 1291.

---

[0]We review the district court's findings of fact for clear error, <u>Sheet Metal Workers Int'l Assn., Local 19 v. 2300 Group, Inc.</u>, 949 F.2d 1274, 1278 (3d Cir. 1991), and exercise plenary review over its interpretation, application and conclusions of law. <u>Tudor Dev. Group v. United States Fidelity & Gaur. Co.</u>, 968 F.2d 357, 359 (3d Cir. 1992). We review the cross-appeal of a denial of attorneys' fees under the Lanham Act for abuse of discretion. <u>Standard Terry Mills, Inc. v. Shen Mfg. Co.</u>, 803 F.2d 778, 782 (3d Cir. 1986).

In this case, the mark is registered and incontestible, so plaintiff had to show only likelihood of confusion to be entitled to relief. Because the goods in question are not in direct competition, the district court applied the ten-factor test of Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983). The district court found "purchasers of ordinary intelligence" were unlikely to confuse the Fisons' Fairway trademark with Vigoro's Fairway Green mark. On appeal, Fisons contends the court misapplied the Lapp factors and should have applied the law of reverse confusion.

In its analysis of the likelihood of confusion, the district court combined some of the ten factors set out in Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 293 (3d Cir. 1991) and Lapp and omitted others. We follow its outline and note the corresponding Lapp factors in parentheses.

A. Channels of Trade and Evidence of Actual Confusion (Lapp factors (6), (4), (7), (8) and (3)).

> The district court stated:
>     These two products, fertilizer and peat moss, are sold in similar channels of trade, including retail home and garden supply stores, and they are directed to the same or similar purchasers, homeowners who do their own lawn and garden care. With Vigoro placing its product in the market in August of 1992, and having implemented an extensive plan for promotion and advertising in that market, one would have expected that, if there were a substantial risk of actual confusion in the market place, the plaintiff would have come forward at the trial in July

19

> of 1991 with some evidence of that actual
> confusion.  It did not.

Fisons Horticulture, slip op. at 8.  Although acknowledging the

channels of trade (Lapp factor (7)) and the target audience (Lapp

factor (8)) were the same or similar, the district court did not

weigh these similarities in Fisons' favor.  Instead, it appeared

to assume that because of these similarities, plaintiff should

have been able to collect and present evidence of actual

confusion (Lapp factor 6)) if there had been any risk or

likelihood of confusion.  Because plaintiff did not present such

evidence, the court apparently failed to count the similarities

in channels of trade and target audience in Fisons' favor.  The

district court misapplied the law here.  In Lapp, we did not

discount the strength of plaintiff's case in one area because of

weakness in another; we weighed each factor separately.[0]  More

importantly, while evidence of actual confusion would strengthen

plaintiff's case, it is not essential.  As we stated in Lapp,

"Once a trademark owner demonstrates likelihood of confusion, it

is entitled to injunctive relief."  Lapp, 721 F.2d at 462.

Furthermore, the district court's conclusion that any

evidence of actual confusion (Lapp factor (6)) would have

appeared in the time the two products were on the market (Lapp

_____

[0]This is not to say that all factors must be given equal weight.
The weight given to each factor in the overall picture, as well
as its weighing for plaintiff or defendant, must be done on an
individual fact-specific basis.  Not all of the factors are
present in every case.  We have emphasized the importance of
similarity of the marks in likelihood of confusion, Ford Motor
Co., 930 F.2d at 293, but we have not ranked the factors
otherwise.

factor (4)) may not be warranted in this case. The district court stated that Vigoro had placed its product in the market in August, 1991, a year before the start of the trial, but that finding was in error. August, 1991 was the date of the trade show when Vigoro first displayed its new product, not the date of distribution to retail outlets or even to distributors. The fertilizer was not shipped to distributors until January 1992 and probably was not offered to consumers until a month or more after that. The test is the likelihood of confusion from the perspective of ordinary consumers, not from the perspective of people in the trade. See Ford Motor Co., 930 F.2d at 297. By the start of trial, the product had been available to consumers for less than six months.

When parties have used similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products, there is an inference that future consumers will not be confused either. See e.g. Scott Paper, 589 F.2d at 1230 (finding no likelihood of confusion in part because "defendant's mark had been utilized . . . for over forty years without any evidence of actual confusion."). In this case, the district court will have to reevaluate Lapp factor (4) in light of the fact that Vigoro's produce was not available to consumers until the winter or spring of 1992. In addition, the court should take into account that the products were ones consumers

21

spend little time and care in selecting; in the case of such

products, confusion as to their origin may pass unnoticed.[0]


B.  Similarity of the Two Marks (Lapp factor (1)).

As we have said, degree of similarity of the marks may

be the most important of the ten factors in Lapp.  Ford Motor

Co., 930 F.2d at 293.  In considering this factor, the district

court noted the obvious similarities in Fisons' and Vigoro's

marks.  "Both include the word fairway.  Both attempt to

associate the product with golf, and both do so by using a

package design that has a golf course green, a pin on the green

and a red triangular flag on the pin [as opposed to the

rectangular flag generally found on golf courses]."  Fisons

Horticulture, slip op. at 8.  The court, however, declined to

find these similarities confusing.  It stated:

---

[0]Because the products at issue represent a small investment for
the consumer, this may not be a case in which actual confusion
would readily manifest itself to a manufacturer.  The products
are not likely to malfunction.  If the consumer thinks Fairway
peat moss and Fairway Green fertilizer are produced by the same
company, the manufacturers may not know. "Purchasers are unlikely
to bother to inform the trademark owner when they are confused
about an inexpensive product."  Beer Nuts v. Clover Club Foods
Co., 805 F.2d 920, 928 (10th Cir. 1986); see also Union Carbide
Corp. v. Ever-Ready, Inc., 531 F.2d 366, 383 (7th Cir.), cert.
denied, 429 U.S. 830 (1976).

The court did not discuss Lapp factor (3), the price of
the goods and other factors indicative of the care and attention
expected of ordinary consumers when making a purchase.  The
greater the care and attention, the less the likelihood of
confusion.  Although the district court made no finding on this
factor, there was uncontested evidence in the record that
consumers spend little time and attention deciding which of the
low-cost products to buy in this market.

22

> [W]hile the two marks incorporate the word [fairway][0], they do so in ways that suggest somewhat different things. Fairway suggests a thing or a place, a golf course fairway. Fairway Green suggests a color, the color of a golf course fairway (although including a drawing of a golf course green on the package may lead one to associate Fairway Green with the green on a golf course). The names alone do not, therefore suggest a risk of confusion.

Id. at 8-9 (footnote added). The court went on to note that while there were some similarities in the packaging, the differences in design, color, and materials were so substantial they tended to differentiate the products and sellers.[0] Id. at 9.

The fact that there may be some differences in what the two names suggest is not alone enough to conclude the names are not confusingly similar. Vigoro's use of Fisons' entire trademark, "Fairway," in an arc over a descriptive word, "green," suggests a likelihood of confusing similarity. "[A] subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-descriptive matter to it." J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition, § 23:15[8] at 23-102 (3d ed. 1992). Vigoro contends that courts have not recognized such a rule explicitly, but this court and others have recognized it implicitly. In Lapp, we

---

[0]The district court's opinion used the word "green" here, but it must have meant "fairway," because both marks contain only one common word, "fairway."

[0]Fisons pointed out the similarities in the pictures of golf course greens on the packages, but made no claim for trade dress infringement. However, similarity in trade dress is "highly probative" of likelihood of confusion. Ford Motor Co., 930 F.2d at 297.

found the trademarks "Lapp" and "Lapp Cable" identical for all practical purposes. 721 F.2d at 463. See also Tree Tavern Products, Inc. v. Conagra, Inc., 640 F.Supp. 1263, 1270 (D. Del. 1986) ("[S]imilarity between the marks 'Side Dish' and 'Banquet Side Dish for One' is obvious"); Country Floors, Inc. v. Gepner, 930 F.2d 1056 (3d Cir. 1991) (where dominant portions of two marks, "Country Floors" and "Country Tiles," are the same, confusion is likely). Here, the similarity of marks resembles that in Lapp. As Fisons correctly noted, trademark infringement does not require exact copying of the trademark as the owner uses it. "The marks need not be identical, only confusingly similar." Merchant & Evans, Inc. v. Roosevelt Bldg. Products Co., 963 F.2d 628, 636 (3d Cir. 1992) (quoting Country Floors, 930 F.2d at 1063). They are confusingly similar if ordinary consumers would likely conclude that Fairway peat moss and Fairway Green fertilizer share a common source, affiliation, connection or sponsorship. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 957 (7th Cir. 1992); see also International Kennel Club, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1089 (7th Cir. 1988); M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 449 (4th Cir. 1986).

In analyzing the appearance of the products, as in analyzing their names, the district court did not seem to focus on the overall impression. As the United States Court of Appeals for the Second Circuit stated, the test for determining the similarity of the marks is "whether the labels create the 'same overall impression' when viewed separately." Banff, Ltd. v.

24

Federated Dep't Stores, Inc., 841 F.2d 486, 492 (2d Cir. 1988) (citations omitted). See American Auto. Ass'n. v. AAA Ins. Agency, Inc., 618 F. Supp. 787, 792 (W.D.Tex. 1985) (In determining whether two marks are confusingly similar, appropriate test is not side-by-side comparison of marks, the emphasizing differences in detail, but whether average consumer, on encountering one mark in isolated circumstances of marketplace and having only general recollection of the other, would likely confuse or associate the two.)  In Ford Motor Co., 930 F.2d at 293, we stated:

> Perhaps the most important of these [10] factors is the first on the Scott Paper list: the degree of similarity between the two marks.  We recently held that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'"

Id. at 293.

We conclude the district court misapprehended the legal standard when it undertook a detailed analysis of the differences in the marks rather than focusing on the overall impression created by them.

C.  Strength of the Fairway Mark (Lapp factor (2)).

        The district court credited Fisons' evidence of
strength of its mark: that the mark was incontestible within the
meaning of the Lanham Act, 15 U.S.C. §§ 1058, 1065,[0] that it was
a strongly suggestive mark bordering on being arbitrary, and that
it had been in use for thirty years.  However, the court
concluded:

> This list of examples of the strength of
> the Fisons mark is not particularly
> compelling evidence of risk of confusion.
> Fisons has not, for example, shown that its
> FAIRWAY mark is uncommon, or contains an
> unusual use of the word; nor has it shown
> that it has built up the strength of the mark
> over the years with a substantial economic
> investment that can be confirmed by evidence
> of a depth of consumer awareness of the mark
> and its product.  Fisons' failure to offer
> this evidence undermines its argument that
> FAIRWAY is, in fact, a strong mark.

Fisons Horticulture, slip op. at 10.  Fisons contends the
district court applied incorrect standards in ignoring its
evidence of strength and using other tests for the strength of
its mark.  Fisons argues its mark qualifies for protection
because of its distinctiveness.  Trademark law recognizes
categories of marks based on their levels of inherent
distinctiveness.  From least to most distinctive, they are: (1)
generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5)
fanciful.[0]  Two Pesos, Inc. v. Taco Cabana, Inc., 112 S.Ct. 2753,

---

[0]For the meaning of "incontestible" under the Lanham Act, see,
supra, n. 7.
[0]Sometimes, only four categories are used, with arbitrary and
fanciful grouped together.  See e.g. Dranoff-Perlstein Assoc. v.
Sklar, 967 F.2d 852, 855 (3d Cir. 1992).

26

2757 (1992). The latter three categories are deemed "inherently distinctive" and are entitled to protection. Id. The word "green" is so common that it has no trademark significance when applied to lawn and garden products, but there was expert testimony, which the district court accepted, that the term "Fairway" was either suggestive or arbitrary.[0] It could therefore qualify for protection.

The district court focused on Fisons' failure to show that its mark, "Fairway," was uncommon or contained an unusual use of the word. The fact that a word is common does not necessarily make it weak or unworthy of protection as a trademark; the district court's focus on an unusual use of the word is closer to mark. As the United States Court of Appeals for the Sixth Circuit stated, "The significant factor is not whether the word itself is common, but whether the way the word is used in a particular context is unique enough to warrant trademark protection." Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1190 n.4 (6th Cir. 1988). The words "shell," "camel" and "apple" are not uncommon, but they are arbitrary when applied to gasoline, cigarettes and computers. 1 McCarthy on Trademarks,

_____

[0]Arbitrary trademarks are ones that do not describe any quality or characteristic of the goods or services for which they are used. The mark "V-8" on juice made from eight different vegetables was held to be arbitrary. Standard Brands, Inc. v. Smidler, 151 F.2d 34 (2d Cir. 1945). As a result of advertising, consumers came to associate the mark with such a drink, but without advertising, no one could have reasonably expected consumers to associate V-8 with a vegetable juice cocktail. Id.; see also 1 McCarthy on Trademarks § 11.04[1].

27

§11:26[3].[0] Similarly, the term "Fairway," is not uncommon, but when applied to peat moss, Fisons' expert stated it ranked between arbitrary and suggestive on the scale of distinctiveness. Fisons therefore presented evidence that its use of the common term was unusual enough that it could qualify for trademark protection.

Distinctiveness on the scale of trademarks is one measure of a mark's strength. See, e.g., Nutri/System Inc. v. Con-Stan Industries, Inc., 809 F.2d 601, 605 (9th Cir. 1987). Commercial strength, or marketplace recognition of the mark, is another. See e.g. Ford Motor Co., 930 F.2d at 297. Vigoro contends the registration and use of "Fairway" as a trademark by third parties for related products and services undermines Fisons' claim of the strength of its mark. O.M. Scott registered a trademark, "Super Fairway," for commercial fertilizer in 1989, and six other companies have active or pending registrations of marks using the term "Fairway" for grass seed, lawn and garden machinery and equipment, and lawn services. While other registrations and uses of Fairway for related products and services would make the mark less strong if they were in the same market, their use in different markets and for products and services that are not closely related does not necessarily undermine Fisons' claim of strength.

---

[0]McCarthy refers to the conclusion that a common word is automatically "weak" as a trademark as the 'Common Word' fallacy. 1 McCarthy on Trademarks § 11.26[3].

28

The district court found Fisons had not demonstrated it had built up consumer awareness of the mark and its product through substantial investment and concluded Fisons' failure to offer evidence of commercial strength "undermines its argument that FAIRWAY is, in fact, a strong mark." Fisons Horticulture, slip op. at 10. If this were a case of forward confusion, rather than reverse confusion, the district court would be correct in giving considerable weight to evidence of commercial strength, or its absence.

But in a case of reverse confusion, the evidence of commercial strength is different from what we expect in a case of forward confusion, where the junior user tries to palm off his goods as those of the senior user. In forward confusion, the junior user trades on the senior user's good name; it is therefore saved much of the expense of advertising to create market recognition of its mark. In reverse confusion, the junior user is typically a wealthier, more powerful company who can overwhelm the market with advertising. An aggressive junior user may thereby achieve greater commercial strength in a short period of time than the senior user has after years of marketing its product. See, e.g., Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1367-68 (10th Cir. 1977) (in one year, defendant Goodyear spent over $9,690,000 in massive, nationwide promotional campaign using "Bigfoot" trademark of plaintiff, a small tire-buying organization with total net worth of $200,000). "The result is that the senior user loses the value of the trademark -- its product identity, corporate identity, control

29

over its goodwill and reputation, and ability to move into new markets."  Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960, 964 (6th Cir. 1987).  In one year, Vigoro spent over $500,000 on advertising its new product, Fairway Green.  That is approximately the amount of Fisons' total yearly sales of Fairway peat moss.

Fisons' Fairway mark was strong on the scale of trademarks and in active use when Vigoro started using the Fairway Green mark, but it was commercially weak.  The district court, in treating this case like one of forward confusion, put great emphasis on the lack of commercial strength of Fisons' mark and virtually none on its distinctiveness.  In reverse confusion, the mark of the senior user is typically weaker commercially than that of the junior user.  On remand, the strength of Fisons' mark will have to be reevaluated in light of our adoption of reverse confusion and its distinctiveness as well as its commercial strength will have to be considered.

D.  Vigoro's Intent in Adopting the Mark (Lapp factor (5)).

The district court had the following to say about Vigoro's intent:

> The relevant intent inquiry in a likelihood of confusion case is "whether the defendant adopted a mark with the intent of promoting confusion and appropriating the prior user's good will."  W.W.W. Pharmaceutical Co., Inc. v. The Gillette Co., 23 U.S.P.Q.2d 1609, 1619 (S.D.N.Y. 1992), aff'd, 1993 U.S. App. LEXIS 1051 (2d Cir. 1993).  There is no proof that Vigoro adopted the name Fairway green in an attempt to benefit from the general good will developed by Fisons in its FAIRWAY mark.

30

<u>Fisons Horticulture</u>, slip op. at 10.

While the inquiry the district court identifies as the "relevant intent inquiry" is important, it is appropriate to cases of forward confusion, not reverse confusion. In the latter type of case, the junior user does not seek to trade on the good will and name of the senior user; instead he overwhelms it.

The intent inquiry appropriate to this case is more like one we identified in <u>Lapp</u> in relying on the district court's finding that Lapp, "while it may have acted innocently, was careless in not conducting a thorough name search for American uses of the name." <u>Lapp</u>, 721 F.2d at 463. The questions the district court should consider here are whether Vigoro conducted an adequate name search for other companies marketing similar goods under trademarks including the name "Fairway," and whether it followed through with its investigation when it found there were such companies. Did Vigoro consider the likelihood of confusion with other companies' marks and products (as opposed to considering the likelihood that someone would contest its new mark)? Did it attempt to contact companies using a similar mark, such as Fisons? Was Vigoro careless in its evaluation of the likelihood of confusion?

31

E.  Fisons' Plans to Enter the Market (Lapp factor (10)).

> The district court found:
> Fisons currently sells fertilizer in Canada.  At the trial it offered some evidence that it had plans to expand that business into the United States.  There was not sufficient evidence on this point to suggest that this possibility should be a factor in an analysis of a risk of possible likelihood of confusion.

Fisons Horticulture, slip op. at 10.  As this factor appears in Lapp, it includes "other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that it is likely to expand into that market."  721 F.2d at 463-64.  The district court considered only evidence of planned expansion, the second part of the test.  Such a narrow view is not warranted.

Under Lapp, the court looks not only at the likelihood of expansion, but also at facts "suggesting the consuming public might expect the prior owner to manufacture a product in the defendant's market."  721 F.2d at 463.  In a case of reverse confusion, it may also consider facts suggesting the consuming public might expect the junior owner to manufacture a product in the senior user's market.  One fact suggesting this possibility is that other companies market both products.  Fisons presented evidence that the market leader, O.M. Scott, sold both peat moss and fertilizer under the same brand name, Hyponex.  In addition, three other lawn and garden companies in this country, Kellog, Gandini and Fertiloam sell both peat moss and fertilizer under the same brand name.  Therefore, the public is used to seeing

32

both fertilizer and peat moss marketed under the same name by the same company.

Second, the products are closely related and are used together in preparing lawns and gardens. Even if other companies did not market both products, the consuming public might find it natural for one company to do so. See, e.g., International Kennel Club, 846 F.2d at 1089 (fact that parties' products are the kind the public might very well attribute to the same source provides additional evidence of likelihood of confusion).

Finally, there is Fisons' evidence of planned expansion. In Lapp, we stated:

> One of the chief reasons for granting a trademark owner protection in a market not his own is to protect his right someday to enter that market. 2 J.T. McCarthy, Trademarks and Unfair Competition § 24:5 (1973). When it appears extremely likely, as it does here, that the trademark owner will soon enter the defendant's field, this . . . factor weighs heavily in favor of injunctive relief.

Lapp, 721 F.2d at 464. In Lapp, where the evidence showed expansion to be extremely likely, the factor weighed heavily in plaintiff's favor. If there is evidence of expansion, but it is less strong, it will weigh less heavily in plaintiff's favor.

F. Relationship of the Goods (Lapp factor (9)).

The district court did not consider this factor, "the relationship of the goods in the minds of consumers because of the similarity of function." Fisons' peat moss and Vigoro's fertilizer are both sold as soil conditioners and meant to be

33

used for the same purpose: to improve the soil for planting.  The question is whether the consumer might therefore reasonably conclude that one company would offer both of these related products.  In Scott Paper, 589 F.2d at 1230, we noted other cases in which the relationship of the products was close enough to lead to the likelihood of confusion and the relationship of those products: Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1173 (2d Cir. 1976) (women's scarves and apparel with women's cosmetics and fragrances); James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 275 (7th cir. 1976) (liquor with restaurant selling liquor); Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 381-82 (7th Cir.), cert. denied, 429 U.S. 830 (1976) (batteries and lamps with light bulbs and lamps); Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., 350 F. Supp. 1341 (E.D. Pa. 1972), aff'd without opinion, 480 F.2d 917 (3d cir. 1973) (pipe tobacco and bar accessories with scotch whisky).  See Scott Paper, 589 F.2d at 1230.

In Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir. 1988), the court analyzed this factor under the category, "Relatedness of the Goods."  It assessed the relatedness of the car care products one company sold to consumers and the bulk car wax for use in car washes and the car washing service another company sold under an essentially similar trademark.  The court noted the test was whether the goods were similar enough that a consumer could assume they were offered by the same source.  The court concluded, "A consumer who was used to buying CLASSIC products to wash his or her car could easily assume that the

34

makers of CLASSIC products had expanded into the car wash business."  839 F.2d at 1187.

In this case, the question is whether a consumer who bought Fisons' peat moss could reasonably assume that the company had expanded its offerings to include fertilizer or, as would be more likely in this case of reverse confusion, whether a consumer who bought or saw the advertising for Fairway Green fertilizer could reasonably assume that the same source also offered the Fairway peat moss it saw in the stores.

G.  Weighing the Factors

Of the ten factors set out in Ford Motor Co. and Lapp for determining the likelihood of confusion, the district court misapplied some and did not consider others.  On remand, it should consider each of the factors and weigh each in a manner consistent with this opinion and with the other case law.

H.  State Law Claims

The district court concluded that Fisons' Lanham Act claims failed because there was no likelihood of confusion and, therefore, its state law claims failed as well.  Because the court will reconsider the likelihood of confusion on remand, it should also reconsider Fisons' state law claims.

IV.

For reasons stated above, we will reverse the judgment of the district court as to Fisons' claims under the Lanham Act and remand for a new trial on those claims and the state law

35

claims.[0] We will affirm the judgment of the district court denying Vigoro's claim for attorneys' fees as a prevailing party under the Lanham Act.

Fisons Horticulture v. Vigoro Industries
No. 93-7224 and 93-7287

GARTH, Circuit Judge, concurring in part and dissenting in part:

The majority opinion has convincingly analyzed this appeal under Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225 (3d Cir. 1978) and Interpace Corp. v. Lapp, 721 F.2d 460 (3d Cir. 1983). While I am in wholehearted agreement with the majority that we must reverse the district court's ruling on the merits,[0] I can see no purpose in remanding for retrial of Fisons' Lanham Act claims when it is so evident that the marks at issue here are confusingly similar.

Accordingly, I would reverse the decision of the district court, enter judgment in favor of Fisons on its Lanham Act claims, and remand with instructions that the district court fashion the appropriate relief, and consider Fisons' state claims.

---

[0] We recognize that an extensive record has already been developed in this case. We will leave it to the sound discretion of the district court to determine whether any additional evidence is appropriate.

[0] I also agree with the majority that we must affirm the district court's denial of Vigoro's request for attorneys' fees inasmuch as Vigoro is no longer the prevailing party under 15 U.S.C. § 1117.

36

The majority's able opinion not only details the analysis required in Lanham Act cases, but also applies that analysis to the record before us on appeal. Typically, having found error in the district court's application of the Lapp analysis, we would reverse and remand to the district court with instructions to take actions consistent with the foregoing opinion.

Nevertheless, I see little need to do so in the present case. Judge Scirica's majority opinion already has performed the Scott Paper/Lapp analysis and the requisite balancing. That analysis can lead to only one conclusion: that the district court erred in ruling for Vigoro on the merits of Fisons' Lanham Act claims.

Although we have held that a district court's finding of similarity does not necessarily compel a conclusion that two marks are confusingly similar, Merchant & Evans, Inc. v. Roosevelt Building Products Co., Inc., 963 F.2d 628, 636 (3d Cir. 1992); Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1065 (3d Cir. 1991), we also have held that "[p]erhaps the most important of [the] factors is the first on the Scott Paper list: the degree of similarity between the two marks." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 293 (3d Cir. 1991). In Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990), we held that, "if the overall impression created by the marks is essentially the same, 'it is very

37

probable that the marks are confusingly similar.'" (Citation omitted).

As the majority recognizes, in analyzing the appearance of the products at issue here, the district court failed to focus on their overall impression. Maj. Op. typescript at 25. One need only look at the marks themselves to conclude that they are so similar that one can only wonder how an ordinary consumer of the goods could be anything but confused by the parties' indistinguishable use of the FAIRWAY mark. The packaging of the products, the prominent use of the word "Fairway," and the inclusion of a triangular flag rising from a tee centered on a golfing green, are, for all intents and purposes, virtually identical as to both products. Under Ford Motor Co. and Opticians Association of America, this similarity all but creates a presumption of the requisite likelihood of confusion.

Consequently, I see no point in ordering the district court to revisit this trademark controversy in its entirety, and compelling the parties to spend additional time, money, and efforts on re-litigating the Scott Paper/Lapp factors, when the conclusion to which the district court must come has been outlined so effectively in the majority's opinion.

II

Accordingly, I would reverse the district court's order and remand with the direction that the district court enter judgment for Fisons on its Lanham Act claims. On remand, then, the district court would have to do no more than fashion the

appropriate relief (i.e., frame an injunction, assess damages, impose or not impose attorneys' fees, costs, interest, etc.) and resolve Fisons' state law claims, which the district court failed to address adequately in its initial decision.  Because the majority would dispose of this appeal in a manner which I believe is wasteful of judicial resources, I dissent from so much of the majority's opinion as would remand to the district court for retrial of Fisons' Lanham Act claims.