Warren K. SMITH, Plaintiff,

v.

AMES DEPARTMENT STORES, INC., Zayre New England Corp., Zayre Central Corp. and Ames Stores, Defendants.

Civ. No. 95–5092 (WHW).

United States District Court, D. New Jersey.

Dec. 9, 1997.

Parker S. Bagley, Gary M. Butter, Stephen Gustavson, Brumbaugh, Graves, Donohue & Raymond, New York City, for Plaintiff.

George Borababy, Mitchell R. Berger, Laura C. Tayloe, Patton Boggs L.L.P., Washington DC, and Arnold B. Calmann, Wendy B. Schreckinger, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, for Defendants.

## OPINION

WALLS, District Judge.

This trademark infringement case comes before the Court upon defendants' motion for summary judgment. Defendants Ames Department Stores, Inc., a Delaware corporation with its principal place of business in Connecticut, Zayre New England Corp. and Zayre Central Corp., both subsidiaries of Ames Department Stores, Inc. (collectively "Ames"), operate retail discount stores in northeastern and mid-atlantic states. Plaintiff Warren K. Smith claims that defendants' use of the terms "one for the big guy," and "Big Guys" ' in its in-store department for big men's clothing infringes his federally registered logo for certain apparel containing the words "BIG GUY/little man" and a prominent design element. Smith also claims that defendants have infringed his common law right to the two words "Big Guy" as a mark. For the following reasons, the Court finds that Smith has not shown sufficient market penetration to establish a common law right in "Big Guy" as a mark. The Court further finds that there is no likelihood of confusion between Ames' use of "one for the big guy," "Big Guys" ' and Smith's federally registered "BIG GUY/little man" logo. Defendants' motion for summary judgment is therefore granted.

## BACKGROUND

### A. Factual Background

#### 1. Smith's Use of "Big Guy"

In 1991, plaintiff Warren K. Smith, then a district manager of an office furniture company, conceived a marketing plan for a line of clothing embodying his philosophy that role models or "big guys" come in all sizes and ages and serve as examples for the "little man."[1] (Smith Decl. ¶ 1.) He created a logo design for use with this philosophy containing the words big, guy, little and man, bordering the interior of a square with a prominent design element in the middle. The words big and guy are in capital letters and the words little and man are in lower case letters. According to Smith, the design element of his logo stands for family, with portions representing sun, earth, blood, and water. On January 2, 1992, Smith applied to the United States Patent and Trade Office ("PTO") to register his logo for "undergarments, namely undershorts and shirts ." (See Pl.Ex. 5.) Because he had not yet used the logo, Smith's application was based on intent to use rather than actual use.[2]

In 1993, Smith founded Big little International, Inc., "a company dedicated to marketing active lifestyle casual clothing such as T-shirts, baseball caps, underwear, shorts and related apparel." (Smith Decl. 1.) On February 1, 1993, Smith made his first interstate sale of clothing bearing the "BIG GUY/little man" logo by selling twelve T-shirts with the words "Big Guy," five logo T-shirts and one pair of logo boxer shorts to three acquaintances. On October 12, 1993, the PTO granted U.S. Trademark Registration No. 1,798,-760 to Smith for his hand drawn "BIG GUY/little man" logo. In granting him the registration, the PTO required Smith to disclaim exclusive rights to the word "man." (See Bagley Decl.Ex. 4.)

A year later, plaintiff made two other sales. In February 1994, he sold 108 T-shirts and thirty-six hats to Landmark Pants Corporation and 702 T-shirts and 288 hats to its sister company, The Pants Set, Inc. Of the 108 shirts sold to Landmark Pants, seventy-two had the term "Big Guy" printed on the front while the rest bore the logo. Of the 702 T-shirts sold to the Pants Set, 216 bore the logo and 486 the text. Most of the shirts were in men's size extra large. Landmark Pants distributed Smith's products equally among three of its "Jeans Country" stores, two in New York and one in New Jersey. The Pants Set dispersed his products equally among thirteen of its "Just Shirts" stores in seven states, Florida, New Jersey, New York, Massachusetts, Connecticut, Pennsylvania, and Virginia. Neither company placed additional orders. The total value of Smith's sales through November 1994 was less than $10,000.

Smith made his next sale in March 1996 when Casual Male Big and Tall, a big and tall men's retailer, purchased 2,400 T-shirts bearing "Big Guy" in combination with other words or designs. All of these T-shirts were in men's extra-extra large (2X) size or larger. In August 1996, Casual Male Big & Tall placed another order for 2,400 T-shirts bearing the term "Big Guy" alone for delivery in November 1996. All of those shirts were size men's extra-extra large (2X) or larger. J.C. Penney & Co. also placed an order for approximately 528 shirts with "Big Guy" in combination with other words and designs, for delivery in December 1996. These shirts were ordered in a variety of sizes.

Smith attached hang tags to the shirts sold through November 1994. The front of the hang tags bore Smith's federally registered logo and the backs described Smith's big guy philosophy.[3] (Smith Tr. at 243–45; Boraba-

---

1. Smith also has a separate line for women marketed as "Big Girl/little woman."

2. Under the Lanham Trade—Mark Act, 15 U.S.C. § 1051, *et seq.*, an application for federal registration may be based on actual use of the mark in commerce or *bona fide* intention to use the mark. Where an application is based on intent to use, the application may be filed before use has commenced. However, the registration may not issue until the applicant has actually used the mark in commerce and has filed with the PTO either an Amendment to Allege Use or a Statement of Use.

3. The copy read:

 BIG GUY®
 IT'S NOT HOW LARGE YOU ARE
 IT'S NOT HOW TALL YOU ARE

by Decl.Exs. 4, 75.). None of these items had a sewn-in label or tag bearing "Big Guy." (Adms. 156–157; Smith Tr. at 123, 241.)

In August 1995, Smith entered into a licensing agreement with APSCO Enterprises, Inc. ("APSCO"), authorizing it to manufacture and sell certain products. (Def.Ex.80.) Since then, Smith's products have been displayed six times at trade shows, including the Big and Tall Men's Apparel Needs Show ("BATMAN"), the "Magic" Show, and the Supershow. (Smith Decl. ¶ 8.) Plaintiff states that he recently received coverage in "Men's Retail" and "Impressions" magazines as a result of his appearances at trade shows but has not provided the Court with copies of these documents. (Id.) He also claims that he has persuaded certain celebrities to wear his products, including, Steven Spielberg, George Plimpton and Maury Povich, as well as Nick Lowry and Aaron Glenn of the New York Jets football team. Various sports figures and actors such as Glenn and "an actor on New York Undercover" have worn his products on television shows. (Id. at ¶ 7.) And he claims that he personally has worn his products on television appearances at least ten times but has not provided the Court with any details regarding this television coverage. (Id.) Outside of these activities, however, Smith has not engaged in any media advertising or other consumer or trade advertising for his product.

Smith claims that in September 1995, he placed an unsolicited sales call to Thomas Joyce, a divisional merchandise manager for Casual Male Big & Tall, to present his clothes as a natural fit for the store. Mr. Joyce, who had never heard of Smith's products, informed him that he lacked authority to buy them. Smith claims that Joyce remarked that Ames used the term "Big Guy" to designate its big men's clothing and owned "Big Guy" as a trademark. Joyce, however, denies stating or believing that Ames owned "Big Guy" as a mark.

Smith does not own a U.S. Trademark for, and has never applied to register, the term "Big Guy." Nonetheless, until October 1996, plaintiff used the ® mark on "Big Guy" standing alone on part of his apparel. He also informed Casual Male Big and Tall that "Big Guy" was a registered trademark of his company. Plaintiff claims that he believed that he was entitled to use ® on "Big Guy" after federally registering his logo because he had used the ® mark on "Big Guy" before receiving his registration for the "BIG GUY/little man" logo. (Smith Decl. ¶ 17.)

### 2. Ames' Use of "Big Guy"

Ames operates approximately 300 regional retail discount stores under its name in fourteen northeast and mid-atlantic states, including New Jersey. These stores sell a wide variety of name brand merchandise including housewares, electronics, jewelry, furniture, garden supplies, toys and apparel for men, women and children. In 1994, Ames hired Joseph Ettore as its president and Chief Executive Officer, Denis Lemire as executive vice-president of merchandising, and Eugene Bankers as senior vice-president for marketing. This new management team developed a plan to increase sales to large-sized men and women, determining that this market was under-served. During fall 1994, Ettore, Lemire and Bankers decided to consolidate big men's apparel in areas within the Ames retail stores separate and apart from regular sized men's clothing. (Lemire Decl. ¶ 7.)

According to defendants, management wanted to refer to these new departments for big men's clothing as "one for the big guys" and to use the term "Big Guys" with these departments largely because of Ettore's previous experience at other department stores which had used the terms to describe their big men's departments and clothing. In 1987, as a senior vice-president at Jamesway, a now defunct discount retailer, Ettore had arranged for Jamesway to sell clothing for big men in separate shops within its stores. Jamesway had adopted Ettore's suggestion that its stores describe these shops and the

IT'S HOW BIG YOU PLAY THE GAME BIG GUY®
FOR ALL THE MEN WE LOOK UP TO little man®

for the little guys we look after
STAND OUT IN A CROWD®
BIG GUY [design] little man®
® BIG little International Inc.

clothing offered as "one for the big guy." (See DefEx. P at 68 .) After leaving Jamesway in 1989, Ettore became president of Stuarts, another regional department store chain. Under Ettore's direction, Stuarts began using the term "Big Guys" in circulars, signs and hangtags to describe the larger men's clothing it had sold until 1994.

In September or October 1994, Ames directed its outside counsel to conduct a trademark search to determine the availability of "one for the big guy." (Robotti Dep. at 26–28.) The search was completed on October 3, 1994,[4] and disclosed no federal or state trademark registration for the expression "one for the big guy" nor any existing federal registration for the term "Big Guy" for clothing. (Borababy Decl.Ex. O at 3 (A02966).) The search did disclose, among other things, an expired federal registration for the term "BIGUY" in a distinctive format for various items of clothing, a suspended application for federal registration for "BIGUY" for children's clothing and a rejected application for "Big Guy" for apparel. (Id. at A02986–A02987.) The search also disclosed a pending application to register "Big Guy" for apparel and drinking glasses by James Wold. Defendants investigated Wold's application by obtaining his file history which noted that Smith's prior application for his "BIG GUY/little man" logo had originally been cited as a possible bar to the application. However, the PTO later issued Wold the registration. The search also disclosed Smith's registered "BIG GUY/little man" logo for undergarments, namely undershorts and shirts. Additionally, the search revealed state registrations for "Big Guy" for, among other things, clothing and for "COMPARE OUR PRICES—WE DON'T SOCK IT TO THE BIG GUYS" for retail men's clothing sales. (Id. at A02993–97.) Finally, the search revealed a number of unregistered uses of "Big Guy" in connection with men's clothing stores, including stores in New Jersey, Florida and California.

Since late November 1994, Ames has used the expression "one for the big guy," and, to a lesser extent, "big guys" ' to denote the size and in-store location of the big men's clothing that it sells. Ames sells primarily brandname merchandise, including jeans, trousers, shirts, T-shirts, outerwear and other licensed apparel in the "one for the big guy" departments. (Lemire Decl., at ¶ 13.) Ames uses "one for the big guy" on overhead signs for its in-store departments, on smaller signs placed above racks or "rounders" and in its weekly advertising circulars which are distributed as newspaper inserts or mailed directly to customers. (Id. at ¶ 11.)

Early in 1995, Ames began to attach hangtags on big men's apparel to make it easier for personnel to place big-men's apparel in the "one for the big guy" departments instead of the regular men's departments and to facilitate customer identification of the clothing. The hangtags display "one for the big guy" in substantially the same format as depicted in the overhead signs. (Compare Borababy Decl. at Pl.Ex. 50 (initial overhead signs) with Lemire Decl.Ex. 5 at A03221 (initial hang tag).) Some of these hangtags had size charts on their backs. (Lemire Decl. at Ex. 5.) The overhead signs are similar to those used for other in-store departments. (Lynn Decl. ¶ 6 and Ex. 1.) In circulars, on some smaller in-store signs and, on occasion, in taped loudspeaker announcements played in its stores, Ames uses the term "big guys" ' to describe the customers for whom this clothing is intended. In some circulars, Ames also uses the expression "also available in one for the big guy sizes." (Lemire Decl.Exs. 6 and 7.) While Ames has sought federal registration for other "in-store shops" such as "Pawsitively Pets," "Diamond District," and "Party Plaza," it has not tried to register "One for the Big Guy." Likewise, Ames has not sought to register the companion name of its in-store department for largesized women's clothes, "Plusizes for Women." (Robotti Decl. ¶¶ 3–4.)

In March 1995, an article appeared in *The Daily News Record,* a men's apparel trade publication, discussing the "one for the big

---

4. Smith has argued that Ames' trademark search was conducted after November 1994, when Ames made the decision to use "Big Guy." In support of this argument, he notes that the report was "mysteriously undated." Pl.Br. at 1 n. 1. However, Ames has supplied the Court with an October 3, 1994 invoice for the report. Accordingly, the Court rejects Smith's argument.

guy" departments—which the article described as "Big Guys' shops"—in Ames stores. The following month, Ames received a letter from plaintiff's counsel attaching cop-. ies of that article and the registration for Smith's logo, claiming that Smith owned trademark rights in the term "Big Guy" and demanding that defendants immediately cease its use of that term in connection with the sale of men's clothing. (Robotti Decl.Ex. 1; Pl.Ex. 6.) In response, Ames requested information from Smith's counsel about Smith's claimed ownership of the term "Big Guy." By letter dated May 12, 1995, Smith's counsel provided Ames with copies of Smith's invoices to his three acquaintances and to Landmark Pants and The Pants Set for the sales described above, as well as color photocopies of Smith's products and specimens of Smith's hangtags. On May 19, 1995, defendants' outside trademark counsel rejected Smith's demands. In doing so, Ames' counsel asserted that: (1) there was no likelihood of confusion between Smith's registered logo and Ames' use of "one for the big guy," (2). Smith's use of "Big Guy" on his products was an ornamental use that gave Smith no trademark rights and (3) Ames' use of "one for the big guy" to describe clothing for big men was permissible fair use and was not likely to lead to confusion. Ames' counsel also claimed that Smith was improperly using the federal registration symbol ® with "Big Guy" because he did not own a federal registration for that term.

## B. Procedural Background

In October of 1995, plaintiff filed this lawsuit alleging that defendants' use of the terms "Big Guy" and "one for the big guy" infringes his right to "Big Guy" as a mark and his federally registered "BIG GUY/little man" logo. On July 5, 1996 plaintiff filed an Amended Complaint asserting three similar causes of action: Count I claims infringement of a federally registered trademark under 15 U.S.C. § 1114. Count II claims false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count III asserts an unfair com-

petition claim under New Jersey common law.[5] While characterized as separate causes of action, the elements necessary for Smith to prove each of his claims are essentially the same. Smith must show that (1) the mark he is seeking to protect is valid and legally protectable, (2) he owns the mark, and (3) Ames' use of an allegedly similar mark to identify goods and services is likely to create confusion concerning the origin of goods or services. See Opticians Ass'n v. Independent Opticians, 920 F.2d 187, 192 (3d Cir. 1990).

Ames now brings this motion for summary judgment arguing that there are no material facts in dispute and that plaintiff cannot establish the elements necessary to prove each of his trademark infringement claims. Specifically, Ames argues that plaintiff's Complaint should be dismissed because: (1) its use of "one for the big guy" and "big guys" ' constitutes permissible fair use and does not infringe plaintiff's federally registered logo; (2) plaintiff lacks a common law right in "Big Guy" as a mark; and (3) plaintiff cannot prove direct or reverse likelihood of confusion. In response, plaintiff argues that disputes over material issues of fact preclude a finding of summary judgment. He claims that paramount of these issues is Ames' bad faith, both in adopting "Big Guy" as a mark and in its continued use of the term after being fully apprised of plaintiff's prior claims to "Big Guy." In addition, he seeks to exclude the declaration and expert report of Dr. Jacob Jacoby on the ground that it will not be helpful to the Court because his opinions are not based on actual consumer survey data and set forth legal conclusions.

## DISCUSSION

### A. Whether Dr. Jacoby's Declaration and Report Should be Excluded

The Court must first decide whether to consider the report and declaration of Dr. Jacob Jacoby, defendants' expert witness who defendants offer for the purpose of showing how consumers perceive Ames' use

5. Analysis under New Jersey common law for trademark infringement is the same as under Section 43(a) of the Lanham Act. Hence, viola-

tion of the act leads to a finding of common law infringement. FM 103.1 v. Universal Broadcasting of New York, 929 F.Supp. 187 (D.N.J.1996).

of "one for the big guys" and how they are likely to understand plaintiff's federally registered logo and use of "Big Guy." In his cross motion, plaintiff describes Dr. Jacoby as a "hired gun with an empty holster—a survey expert who has not conducted a survey." Pl.'s Cross Br. at 1. He argues that Dr. Jacoby's report and declaration will be of no assistance to the Court in determining whether factual issues exist because his opinions are not based on scientific data and also set forth legal conclusions. Plaintiff further asserts that Dr. Jacoby, unlike his expert, Alan Boorstein, lacks experience in the retail clothing industry. Defendants counter that non-survey expert testimony is appropriate in trademark cases. They note that Dr. Jacoby's opinions are based on his review of essentially all of the demonstrative evidence in this case, including Ames' signs, circulars and hangtags. Further, they point out that plaintiff's expert, Mr. Boorstein, states a legal conclusion in his expert report—which deals primarily with the applicable measure of damages in this case—by claiming that he will prove defendants' bad faith.

For the purpose of deciding a summary judgment motion, the Court may consider evidence that would be admissible at trial. Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Fed.R.Evid. 703. Furthermore, Rule 704 provides that except for specific testimony regarding a criminal defendant's mental state, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704.

This Court declines to consider the expert reports submitted by both parties at the summary judgment stage. First, the Court notes that the credentials of Dr. Jacoby, who has extensive experience in the field of consumer response, are not at issue. Instead, the question before the Court is whether his report will be helpful in determining whether defendants are entitled to judgment as a matter of law. While non-survey evidence may be appropriate in some trademark infringement cases (see, e.g., Sunenblick v. Harrell, 895 F.Supp. 616, 619, 627 (S.D.N.Y.1995) (allowing various expert witnesses to present non-survey opinions), aff'd, 101 F.3d 684, 1996 WL 280477 (2d Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996)), Dr. Jacoby's failure to consider data gleaned from actual consumers limits its value for the purpose of demonstrating how consumers view both parties' use of "Big Guy." Similarly, the Court is doubtful that Mr. Boorstein's report, which speaks primarily to the issue of damages, will be of any value in deciding this motion. Because the Court finds that it will be fully able to issue a ruling based solely on the uncontroverted facts presented by the parties and relevant case law, it will exclude both expert reports for the purpose of deciding this summary judgment motion.

### B. Summary Judgment Standard

Summary judgment is as appropriate in trademark infringement cases as it is in any other type of case. Summary judgment should be granted where the moving party establishes that "there is no genuine issue as to any material fact" and it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some alleged factual dispute does not preclude summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1996). Rather, the movant must show that if the evidence submitted were reduced to evidence admissible in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475

U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. In making this determination, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Id.*

### C. Trademark Infringement

Section 43(a) of the Lanham Act provides:
Any person who, or in connection with any goods or services . . . uses in commerce any word, term name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

 Federal registration of a trademark is *prima facie* evidence of the mark's validity, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce. 15 U.S .C. § 1115(a).

Once the right to use the registered mark becomes incontestable,[6] "the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce." 15 U.S.C. § 1115(b). If a mark has not been federally registered, or if a registered mark has not achieved incontestability, the mark is valid and legally protectable only "if the public recognizes it as identifying the claimant's 'goods or services and distinguishing them from those of others.'" *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986) (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §. 15.1 at 657 (2d ed.1984)). Such identification first depends on whether a plaintiff can establish that an unregistered mark is inherently distinctive. If the mark is not inherently distinctive, the plaintiff must show that the mark has achieved secondary meaning—consumer recognition that the mark identifies the product as originating from a particular source. *See Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir.1991) (citing *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir.1990), *cert. denied sub. nom.*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991)).

 Trademark law evaluates a mark's strength along a continuum of distinctiveness ranging from the nondistinctive to the inherently distinctive: Marks may be classified as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. A generic term functions as the common descriptive name of a class of products and is generally not legally protectable. *See, e.g., A.J. Canfield*, 808 F.2d at 292 ("chocolate fudge" is generic when used in connection with chocolate fudge flavored soda); *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) ("shredded wheat" is a generic term when used for a breakfast cereal). A

---

6. A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, that there is no pending proceeding and that there has been no adverse decision concerning the registrant's ownership or right to registration. *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 472 n. 7 (3d Cir.1994).

descriptive mark immediately conveys a characteristic, ingredient or quality of the article or service it identifies and acquires protected status only if the plaintiff can demonstrate that the goods or services have achieved secondary meaning. *See, e.g., Transfer Print Foils, Inc. v. Transfer Print America, Inc.*, 720 F.Supp. 425, 12 U.S.P.Q.2d 1753 (D.N.J.1989) ("Transfer Print" is descriptive for surface decorating machines, related technical machines, material and related technical services to distributors and manufacturers who require designs or words placed on their products).·

■■■■ Suggestive, arbitrary and fanciful marks are considered inherently distinctive, and thus, are afforded the highest level of trademark protection. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979). A suggestive mark requires a consumer to use imagination, thought, or perception to determine the character of the goods or service. *See, e.g., A.J. Canfield*, 808 F.2d at 297; *Taj Mahal Enters. v. Trump*, 745 F.Supp. 240 (D.N.J.1990) ("Taj Mahal" suggestive of an Indian restaurant). An arbitrary mark employs terms that do not describe or suggest any attribute of goods or services sold and a fanciful mark differs in that it uses unfamiliar language coined expressly for the purpose of trademark protection. *See Sunenblick v. Harrell*, 895 F.Supp. 616, 624 (S.D.N.Y.1995), *aff'd*, 101 F.3d 684, 1996 WL 280477 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996).

### D. *Fair Use Doctrine*

■■■■ Evidence of a legally protectable mark is subject to a number of statutory defenses, one of which is the fair use doctrine. Under this doctrine, a defendant is not liable for trademark infringement when "the use of the name, term or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe to users the good or services of such party, or their geographic origin. . . ." 15 U.S.C. § 1115(b)(4). *See, e.g., Wonder Labs, Inc. v. Procter and Gamble Co.*, 728 F.Supp. 1058 (S.D.N.Y.1990). Underlying the doctrine is the principal that

> [w]hen a plaintiff chooses a mark with descriptive qualities, the fair use doctrine recognizes that "he cannot altogether exclude some kinds of competing uses," particularly those which use words in their primary descriptive and non-trademark sense.

*See United States Shoe Corp. v. Brown Group, Inc.*, 740 F.Supp. 196, 198 (S.D.N.Y.), *aff'd*, 923 F.2d 844 (2d Cir.1990). The Third Circuit has held that in order to establish fair use, a defendant must show that he or she (1) used the term merely to describe their product; (2) did not use the term as a trademark; and (3) used the term in good faith. *See Institute for Scientific Info. v. Gordon and Breach, Science Publishers*, 931 F.2d 1002, 1008 (3d Cir.), *cert. denied*, 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991). Furthermore, before deciding whether defendants may avail themselves of the fair use defense, the court must first determine whether plaintiff's mark is clearly descriptive. *Id.* at 1010 (citing 1 Trademarks, at 475 (the fair use defense presupposes that the mark is descriptive)).[7]

Ames argues that its use of "one for the big guy" and "big guys" ' constitutes permissible fair use because the terms are merely used to describe and indicate the location of big men's clothing in its stores rather than as trademarks identifying and designating the

---

7. As Professor McCarthy explains, although the Third Circuit has adopted the view that "fair use is only a defense against a descriptive, not a suggestive trademark," there is another view, and in his opinion a better view, which holds that "one can make a non-infringing, descriptive 'fair use' even if the senior user is not using that term in a descriptive sense with its goods and services. That is, the key is the junior user's descriptive use and not the senior user's descriptive use." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11.45 at 11–79. (citing *Seaboard Seed Co. v. Bemis Co.*, 632 F.Supp. 1133 (N.D.Ill.1986)) (rejecting argument by owner of incontestable registration that a fair use was not available because its mark is conclusively presumed not to be descriptive). While this approach has an appealing logic because it more directly addresses the issue of infringement, the Court is clearly bound by Third Circuit precedent.

source of goods and services. Ames further argues that plaintiff has failed to identify any material issue of fact regarding their good faith. Plaintiff argues that material issues of fact exist as to each element of the defense, particularly whether defendants have used the terms in good faith. He claims that Ames acted in bad faith because James Wold's suspended registration for "Big Guy" indicated that there was a potential likelihood of confusion with his federally registered "BIG GUY/little man" and, knowing this, Ames nonetheless failed to investigate plaintiff's use. He also claims that defendants acted in bad faith by continuing to use "one for the big guy" and "Big Guys"' even after he sent them a cease and desist letter.

■■■■ It is elemental to the Court that the term "Big Guy" is common English slang for a large-sized man and that, for quite some time, men's clothing retailers have used the term "Big Guy" to describe large-sized men's apparel. Nonetheless, even though Ames uses "one for the big guy" and "Big Guys"' to describe and locate their in-store departments for big men's clothing, it cannot seek refuge under the fair use doctrine at the summary judgment stage because the distinctiveness of Smith's registered logo and unregistered use of "Big Guy," both of which he claims are arbitrary marks, present genuine issues of material fact. Accordingly, this Court will not grant summary judgment on the ground of fair use. The Court therefore will turn to defendants' other arguments.

### E. Whether Plaintiff has a Common Law Right in "Big Guy" as a Mark

Smith must fall back on common law rights because he does not own a federal trademark for "Big Guy." Defendants argue that Smith has no protectable common law right in "Big Guy" as a mark because (1) "Big Guy" as used by Smith is, at most, descriptive and therefore requires proof of secondary meaning—that consumers identify the term with him—which he cannot establish; (2) he has not achieved sufficient market penetration to afford him protection for "Big Guy"; and (3) he has used "Big Guy" only in a non-trademark, ornamental fashion. Because the determination of where plaintiff's use of "Big

Guy" and his federally registered logo falls along the spectrum of distinctiveness raises a material question of fact, defendants are not entitled to summary judgment on this basis. However, the Court may consider whether Smith has demonstrated sufficient market penetration to withstand summary judgment.

In *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383 (3d Cir.1985), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257, the Third Circuit observed that "the trademark of a prior user should be protected from infringement by a subsequent user of the same mark only in areas where the prior user has established a market for its goods." *Id.* at 1394. Lack of market penetration precludes a common law right to use the trademark in question because exclusive right to a trademark rests upon appropriation and use, not on federal registration. *See id.; Wiener King, Inc. v. Wiener King Corp.,* 407 F.Supp. 1274, 1280 (D.N.J.1976), *aff'd* 577 F.2d 731 (3d Cir.1978). Under the principles laid down by the Third Circuit in *Natural Footwear,* "the senior user of a common law mark may not be able to obtain relief against a junior user in an area where it has no established trade, and hence no reputation and no good will." 760 F.2d at 1394. The court observed that "a party should be awarded ownership of a mark in a specific geographic area only when the party's mark has achieved market penetration that is 'significant enough to pose the real likelihood of confusion among the consumers in that area.'" *Id.* at 1397 (citing *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir. 1967)). To be awarded such rights, that party "must make a showing of 'clear entitle[ment]'" to protection of its mark in a particular market. *Id.; ACCU Personnel, Inc. v. AccuStaff, Inc.,* 846 F.Supp. 1191 (D.Del.1994).

■■■■ In determining whether market penetration is sufficient to warrant trademark protection, a court must consider: (1) the volume of sales of the trademarked product; (2) the growth trends in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area. *See Natural*

*Footwear,* 760 F.2d at 1398–99. While there are no bright line tests to determine whether or not a product has achieved market penetration; *see Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 473–74 (3d Cir.1990), "sales volume must be more' than *de minimis.* When sales activity does not exceed even a minimum threshold level, a court may properly conclude that market penetration ... simply has not been demonstrated." *ACCU Personnel,* 846 F.Supp. at 1206 (citing *Natural Footwear,* 760 F.2d at 1400). This ensures that a plaintiff does not preempt markets "before it actually enters them by actual sales, reputation, or advertising." 2 J. McCarthy at McCarthy on Trademarks 26.07 [4] at 26:9. Accordingly, market penetration is evaluated "as of the time the junior user adopted and began using the trademark." *ACCU Personnel,* 846 F.Supp. at 1206.

Smith argues that his initial sale in February 1993 and his subsequent sale of over 1,100 articles of clothing clearly establish that he has common law trademark rights in "Big Guy." He asserts that his subsequent licensing efforts, extensive sales solicitations, and the substantial orders he has received since the initial commercial sales undeniably demonstrate his intention to continue exploiting his mark in a commercial way. And he further stresses that he has expended "vast amounts of personal time and energy to develop his trade in 'big guy' products." In addition, plaintiff claims that Ames' bad faith in selecting the terms "one for the big guy" and "Big Guys" ' precludes it from arguing that he has not attained market penetration. He contends that because Ames' trademark search revealed his federally registered "BIG GUY/little man" logo, Ames was required to investigate further.

■ Smith has not made a colorable showing that Ames acted in bad faith and has not demonstrated sufficient evidence of market penetration. Ames' trademark search was performed in early October 1994. When the search disclosed James Wold's application for "Big Guy" for clothing, Ames' attorneys obtained his application file. The file showed that the PTO had initially believed that Wold's use of "Big Guy" might cause confusion with Smith's logo, but then reversed itself, determining instead that "Big Guy" was not confusingly similar to Smith's logo. The Court does not see why this discovery would have required Ames to investigate further. Moreover, Ettore had coined the term "one for the big guy" while at Jamesway in 1987 and also used the term at Stuarts, from 1989 until 1994 to designate the location of big men's clothing, long before Smith began using "Big Guy" or his logo.

Plaintiff's heavy reliance on *ISCYRA v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749 (2d Cir.1996) is similarly unavailing. In that case, the defendant had his attorneys conduct a search that was limited solely to federal registrations and applications for clothing and ignored his attorney's express advice that a broader search be conducted. *Id.* at 752–753. Here, by contrast, Ames' search covered federal and state registrations and applications, as well as common law uses. Moreover, *Hilfiger* is further distinct factually because in that case the defendant had intentionally copied the plaintiff's mark. *Id.* at 753–754. Here, Ames' continued use of the terms after receiving Smith's cease and desist letter does not, by itself, suggest wrongful intent. *See Wonder Labs Inc.,* 728 F.Supp. at 1064 ("The fact that, prior to the commencement of the lawsuit, defendant did not abandon its project at plaintiff's suggestion, does not itself evidence a lack of good faith.") (citing *Andy Warhol Enters., Inc. v. Time, Inc.,* 700 F.Supp. 760, 766 (S.D.N.Y. 1988)).

■ "Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 575 (2d Cir.1993). Ames' search and follow-up preclude any triable issue of fact as to bad faith or carelessness. *See Lang,* 949 F.2d at 584 ("adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith"); *Oxford Indus., Inc. v. JBJ Fabrics, Inc.,* 6 U.S.P.Q.2d 1756, 1762 (S.D.N.Y.1988) ("actual and constructive notice ... [of] registered trademark ... is not necessarily evidence of

bad faith."). In *Sizes Unlimited Inc. v. Sizes to Fit*, 871 F.Supp. 1558 (E.D.N.Y.1994), a factually similar case, the court found good faith where the defendant, a retailer selling large-size women's clothing using the name "SIZES TO FIT," knew of plaintiffs' similarly-named stores, "SIZES WOMAN" and "SIZES UNLIMITED." but believed that "sizes" was a common descriptive term used in the fashion industry." *Id.* at 1566 ("defendant's awareness of some of plaintiffs' store names, in the absence of some greater indication of recognition of the mark at issue in the minds of the consuming public ... than is present in this case, does not support a finding of bad faith").

Finally, an examination of the record in this case leads the Court to conclude that Smith had not attained any market penetration by November 1994, when Ames began using "one for the big guys" and "Big Guys'." At that time, Smith had only sold 552 "Big Guy" T-shirts, 274 logo T-shirts and 324 "Big Guy" hats. Moreover, these products were geographically dispersed across sixteen stores in seven states. His greatest market penetration occurred in New Jersey where he sold 132 "Big Guy" T-shirts, 66 logo shirts and 78 hats. The Court is satisfied that these sales do not come close to the minimum level necessary to achieve market penetration. *See Natural Footwear*, 760 F.2d at 1400 (holding that clothing sales of less than $5,000 and total of over fifty customers in at least two of the three years for which sales data were available was *de minimis*). Moreover, plaintiff has not offered any evidence of growth trends or number of sales in relation to the potential customer base. Finally, plaintiff's advertising has been minimal. He has participated in six trade shows but has offered no evidentiary support for his claims of television coverage and "celebrity endorsement." No reasonable factfinder could determine that Smith has established significant market penetration. Accordingly, plaintiff has failed to establish a common law right in "Big Guy" as a mark.

F. *Likelihood of Confusion Between Defendants' Use and Plaintiff's Registered Logo*

▮ The question remaining is whether there is a likelihood of confusion between Smith's federally registered "BIG GUY/little man" logo and defendants' use of "one for the big guy" and "Big Guys'" to describe and designate the in-store locations of its big mens' clothing departments. Smith proceeds on a reverse likelihood of confusion theory as a basis for recovery. Reverse confusion occurs when a large junior user saturates the market with a mark identical or similar to that of a smaller senior user. *See Fisons Horticulture, Inc. v. Vigoro Industries*, 30 F.3d 466, 475 (3d Cir.1994).

▮ A likelihood of confusion exists if the consuming public assumes upon viewing a mark that the product represented by the mark is associated with a different product represented by the same or similar mark. See 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2301[1] (1992). The showing of proof necessary for a plaintiff to prevail depends upon whether the goods offered by the trademark owner and the alleged infringer are competitive or noncompetitive. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472–73 (3d Cir.1994). If the action involves competing goods, "the court need rarely look beyond the mark itself." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). In these cases, the Court simply analyzes whether the similarity of the marks engenders confusion. *Fisons*, 30 F.3d. at 472–73. However, when

> the plaintiff and defendant deal in noncompeting goods or services, the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold. The closer the relationship between the products, and the more similar their sales contexts, the greater the likelihood of confusion.

*Id.* at 473.

▮ If the junior and senior user are found to deal in noncompeting goods, the court must consider the following factors to determine whether the likelihood of confusion exists: (1) the similarity between the marks, (2) the strength of the first user's mark, (3) the care and attention expected of

consumers when making a purchase, (4) the length of time of concurrent use without evidence of actual confusion, (5) defendant's intent, (6) evidence of actual confusion, (7) channels of trade and advertising, (8) the extent to which the targets of the parties' sales efforts are the same, (9) the relationship of the goods in the mind of the public because of similarity of function, and (10) other relevant factors. *See Lapp*, 721 F.2d at 463.

The Court is not persuaded by plaintiff's argument that the parties deal in competing goods because they both sell inexpensive casual and athletic wear at nearly identical channels of trade. Ames does not simply sell casual and athletic wear. Instead, it uses the terms "one for the big guy" and "Big Guys" ' to identify its big men's departments which offer a range of merchandise, including pants, shirts, outerwear, swimwear and accessories for big men. Smith, in contrast, uses his federally registered logo, which contains a prominent design element, on T-shirts and hats (even though his logo is registered for underwear) in a range of men's sizes. Thus, the parties clearly deal in noncompeting goods. Accordingly, the Court considers those *Lapp* factors addressed by the parties and applicable to this dispute to ascertain whether likelihood of confusion exists.

The Court finds that application of the *Lapp* factors weighs against a finding of likelihood of confusion. First, plaintiff has not established that the marks are confusingly similar. In assessing similarity between marks, "the court must compare the appearance, sound, and meaning of the marks, as well as the manner in which they are used." *See Harlem Wizards Entertainment Basketball v. NBA Properties*, 952 F.Supp. 1084, 1096 (D.N.J.1997). Moreover, in trademark actions that involve picture or design marks, similarity of appearance is controlling. 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23.07. Here, plaintiff contends that when Ames uses "one for the big guy," the term "Big Guy" dominates in size and that "Big Guy" is also a dominant element in his logo. He notes that even an experienced menswear buyer such as Casual Male's Tom Joyce did not remember seeing the tiny words "one for the" on his trips to Ames. However, upon examination, the Court finds that the two marks are highly dissimilar. The lettering of Ames' use of "one for the big guy," which is in smaller-case letters, is different from the block capital letters of Smith's "BIG GUY/little man" logo. Moreover, the large design is unquestionably the dominant portion of Smith's logo. Because Ames uses different words, different lettering, and no design, the Court finds that no reasonable factfinder could find a likelihood of confusion between Smith's logo and Ames' use of "one for the big guy" and "Big Guys.' "

Second, the weakness of plaintiff's mark also weighs against a finding of likelihood of confusion. Traditionally, "the term strength as it applies to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source." *Taj Mahal*, 745 F.Supp. at 248. The degree of distinctiveness attributed to a mark is determined by its placement on the continuum and its commercial strength. *Harlem Wizards*, 952 F.Supp. at 1097. While plaintiff correctly notes that in reverse confusion cases, a court may not place undue emphasis on the senior user's commercial strength, commercial strength nevertheless remains a factor which must be considered. *Fisons*, 30 F.3d at 479. Even assuming that his mark is inherently distinctive, plaintiff's absolute lack of market penetration at the time defendants adopted their use, renders it inconceivable that consumers would confuse plaintiff's and defendants' products.

Smith further argues that confusion is likely because both he and Ames sell low priced merchandise. It is widely accepted as true that consumers are less likely to be confused about the origin of specific goods if they are expensive because the amount of care and attention expended by consumers increases proportionately as the price of the desired goods increases. *Taj Mahal*, 745 F.Supp. at 248–249. Plaintiff's goods include T-shirts and hats that retail for between $13.99 and $20.00. Although defendants have not submitted any evidence regarding the price of their goods, they sell products at discount prices. Nonetheless, this factor does not

weigh in favor of plaintiff because the parties sell different merchandise in different channels of trade. Plaintiff does not advertise in the media but instead exhibits his goods at trade shows and seeks to promote his products by persuading celebrities to wear them in public. Defendants, on the other hand, use "one for the big guys" and "Big Guys" ' in its own circulars and in-store promotions. In addition, the parties do not have the same target audience. Plaintiff has stressed that he sells his clothes to men of all sizes, while defendants' in-store departments are geared only for big men. Because the goods are not marketed through the same channels of trade and are not directed to the same consumer base, the Court finds that consumer confusion is unlikely.

Plaintiff has also failed to demonstrate any examples of actual confusion. Although a plaintiff in a trademark infringement action need not present evidence of actual confusion, "evidence of actual confusion is highly probative of the likelihood of confusion." *Sunenblick*, 895 F.Supp. at 629. As evidence of actual confusion, plaintiff contends that Tom Joyce, a buyer for Casual Male stores, told him that he believed that Ames owned "Big Guy" as a mark, a claim which Joyce denies. Even assuming that Joyce made this comment, it does not present evidence of actual confusion because Joyce did not confuse plaintiff's products with those sold by Ames. Instead, he simply remarked that he thought that Ames owned "Big Guy" as a mark. Because the Court finds that plaintiff has not presented any evidence of actual confusion, it weighs this factor in favor of the defendants.

Finally, the Court finds that there is no evidence that Ames adopted its use of "one for the big guys" and "Big Guys" ' with the intent of overwhelming Smith's good will. *See Fisons*, 30 F.3d at 479. As already established, the Court has not found any evidence of bad faith on Ames part in adopting its use of the contested terms.

Because none of these factors supports plaintiff's claim that consumers would likely confuse the T-shirts and hats he sells under his federally registered logo with goods sold by Ames in its big men's departments, the Court dismisses Smith's complaint in its entirety.

## CONCLUSION

For these reasons, the Court grants defendants motion for summary judgment and dismisses the complaint.