**INTERNATIONAL DATA GROUP, INC., and CXO Media Inc., Plaintiffs,**

v.

**ZIFF DAVIS MEDIA, INC., and CIO Insight Corporation, Defendants.**

**No. CIV A 01–134–RRM.**

United States District Court, D. Delaware.

May 23, 2001.

Richard D. Kirk, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, Julie A. Petruzzelli, Peter J. Curtin, Davida H. Isaacs, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, for plaintiffs.

Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Victor A. Kovner, Elizabeth A. McNamara, Jeffrey H. Blum, Davis Wright Tremaine LLP, New York City, for defendants.

**OPINION**

McKELVIE, District Judge.

This is a trademark case. Plaintiff International Data Group, Inc. is a Massachusetts corporation with its principal place of business in Framingham, Massachusetts. CXO Media, Inc. is also a Massachusetts corporation with its principal place of business in Framingham, Massachusetts. Plaintiff CXO Media is an indirect, wholly owned subsidiary of International Data Group. The court will refer to International Data Group, Inc. and CXO Media collectively as IDG.

IDG provides products and services related to information technology. Either directly or through subsidiaries, IDG produces more than three hundred publications, including newspapers, magazines, and newsletters in print or electronic form. IDG has developed a group of products targeted at chief information officers or other executives that oversee a corporation's information infrastructure. Such products include a magazine called "CIO" that is published twice monthly, CIO.com website, and an electronic newsletter titled "CIO Insider."

Defendant Ziff Davis Media, Inc. is a Delaware corporation with its principal place of business in New York, New York. According to plaintiff, Ziff Davis controls defendant CIO Insight Corporation, which has its principal place of business in New York, New York. The court will refer to Ziff Davis Media, Inc. and CIO Insight Corporation collectively as Ziff Davis. On February 1, 2001, Ziff Davis announced its plans to launch a new monthly magazine entitled "CIO Insight" in May of 2001.

On February 27, 2001, IDG filed a complaint in this court seeking a declaratory judgment that Ziff Davis, through the use of CIO INSIGHT, infringed, diluted and unfairly competed against its CIO trademark and CIO INSIDER trademarks.[1] On March 13, 2001, IDG amended its complaint adding a claim for a declaratory judgment of federal trademark infringement of its CIO Insider trademark.

On March 16, 2001, Ziff Davis filed a motion to transfer this action to the United States District Court for the Southern District of New York. On March 26, 2001, IDG filed a motion for a preliminary injunction seeking expedited relief from possible infringement of the CIO Insider mark.

On March 27, 2001, Ziff Davis answered the First Amended Complaint.

On April 25, 2001, after the parties fully briefed the motions, this court held oral arguments on IDG's motion for a preliminary injunction and Ziff Davis's motion to

---

1. The court will refer to these marks in lower case throughout the remainder of this opinion.

transfer. This is the court's decision on the motion for a preliminary injunction.

## I. FACTUAL BACKGROUND

The court takes the following facts from the pleadings and the affidavits and declarations made in support of and in opposition to the motion for a preliminary injunction.

### A. IDG and the CIO mark

IDG produces a number of products and services related to information technology. According to Joseph Levy, president and chief executive officer of CXO Media, IDG has used the CIO trademark in commerce since September 1987. On August 31, 1999, IDG obtained a federal registration for the CIO mark for "magazines and magazine supplements in the field of computers, computing, computer software, communications and information technology." IDG presently uses the CIO mark in the names of a variety of products including magazines, newsletters for information technology executives, newsletters relating generally to the computer industry, edu-cational conferences, and a website. Levy testified in his declaration that IDG has spent approximately $46.5 million on the marketing and development of these marks and the CIO brand.

IDG uses the CIO mark for a magazine entitled CIO. That magazine is produced twenty-three times per year and has a circulation of over 140,000 subscribers. According to Levy, 135,000 subscribers of CIO magazine (96% of the total) receive the publication free of charge. The remaining subscribers pay a yearly price of $94 for twenty-three issues. IDG submitted the cover of the June 1, 2000 issue as representative of the mark. On that cover, the letters "CIO" are printed in white over a red background. The red background is a box approximately 3.25 inches long and 1.75 inches high with a white border. Underneath the logo is the tagline "The Magazine for Information Executives." IDG has spent approximately $12 million on marketing and brand development for CIO magazine. Figure A is a copy of the logo found on the cover of CIO magazine.

## Figure A

IDG also owns the website CIO.com. According to Levy, the website receives approximately 600,000 hits a day. It contains content aimed at the same market as CIO magazine and includes articles and features from the magazine itself. CIO.com contains the same red and white logo as CIO magazine in the top left hand corner of the front page of the site followed by the phrase ".com." Figure B represents the logo found on CIO.com

Figure B

Since 1997, IDG has produced an electronic newsletter, called CIO Insider, that is closely associated with CIO.com and CIO magazine. IDG sends the newsletter twice a week to approximately 125,000 subscribers via e-mail with the subject line: "CIO Insider" and the sub-heading: "Your Guide to What's New on CIO.com." Because the newsletter is delivered via e-mail, there is no associated logo. Rather, the text appears in a plain font. At oral argument, counsel for IDG stated that approximately 40% of the subscribers to CIO Insider also receive CIO magazine. The newsletter contains headlines and hyperlinks to content on the CIO.com website. At oral argument, counsel for IDG stated that CIO Insider is a revenue source as well as a means of marketing CIO.com and CIO magazine. Although CIO Insider is free to subscribers, each edition has a single advertiser. The advertiser pays $4,500 per 35,000 subscribers. According to counsel, in fiscal year 2000, CIO insider generated $562,000 in gross revenue and IDG projects CIO Insider to generate $1.1 million in fiscal year 2001. For those that do not receive CIO Insider directly, CIO.com contains a link to an archive of the newsletters. The website describes the newsletters as "Your guide to new content and services on CIO.com." Since its 1997 launch, IDG has spent approximately $3 million on marketing and development to promote CIO Insider.

On February 2, 2001, IDG filed an application with the United States Patent and Trademark Office ("PTO") to register the mark CIO Insider for use in "print and online publications; providing a website; arranging and conducting trade shows, expositions, exhibitions, conferences, seminars, symposiums, colloquiums, and discussion groups."

### B. *Ziff Davis and CIO Insight*

Ziff Davis, like IDG, produces numerous magazines related to business and technology. It is the sixth largest magazine publisher in the United States. Ziff Davis and IDG compete on many magazines and share the titles of a number of publications. According to Al Perlman, the president of the business publications division of Ziff Davis, he conceived of the idea of creating a magazine targeted at CIOs and CIO-level individuals in December 2000. Perlman stated that he believed the market was open for new publications and envisioned creating a magazine that would be "a Harvard Business Review for the CIO." In his proposal for the magazine, Perlman suggested that the publication would contain thought pieces, essays, case studies, and proprietary research. He wanted to create a "monthly magazine, with heavy paper, approximately 80 pages in length, not a lot of art and a 50,000 [subscriber] controlled circulation."

According to Perlman, from December, 2000 to March, 2001, Ziff Davis spent more than $1.6 million in research and development of the idea for this magazine. Included in that figure is the time necessary to develop and research a name and logo. Perlman stated that Ziff Davis considered a variety of different titles for the magazine, all of which contained the CIO acronym because "it was critical to have CIO in the title since the acronym identified the magazine's market." Further, according to Perlman, Ziff Davis wanted to reinforce its "branding strategy to create a 'family' of magazines incorporating 'Insight' in the title." At present, Ziff Davis has one other magazine planned in this family, "Internet Insight." Ziff Davis filed an intent-to-use application with the PTO on April 17, 2000 for the Internet Insight mark. Therefore, after considering several possible titles, Ziff Davis began to research the availability of the CIO Insight mark.

Carolyn Schurr Levin, a vice president and general counsel of Ziff Davis, stated in her declaration that in December of 2000, Ziff Davis performed multiple online searches of the records of the PTO and contracted for a trademark availability search by Thomson & Thomson, a trademark and copyright search firm. Through these searches, Ziff Davis found numerous registrations or pending or abandoned applications to register trademarks that include the term CIO. These searches revealed approximately thirty current registrations and pending or abandoned applications for registration by IDG. According to Levin, despite these disclosures, Ziff Davis concluded that there was no basis in common law usage or PTO filings on which another party could claim rights in the magazine title

"CIO Insight." Further, Perlman stated that at the time employees at Ziff Davis selected the name and logo for CIO Insight, they were unaware of IDG's CIO Insider newsletter.

On December 27, 2000, Ziff Davis filed with the PTO an intent to use application to register CIO Insight for print and online publications "in the fields of technology, computers, computing and information services." On February 1, 2001, Ziff Davis issued a press release announcing its plans to launch CIO Insight in May of 2001. As stated above, on February 2, 2001, IDG filed an application with the PTO to register the mark CIO Insider and on February 27, 2001, filed this lawsuit. On March 27, 2001, Ziff Davis filed with the PTO an intent to use application to register the mark Ziff Davis Media CIO Insight.

Perlman stated that Ziff Davis was aware of and wanted to compete with IDG's CIO magazine. In that vein, Perlman claims that Ziff Davis consciously selected a format and logo for CIO Insight that "would be readily distinguishable from CIO magazine." Ziff Davis provided an advance copy of the cover of the premier issue of CIO Insight. On the cover of the magazine, the title CIO Insight is flush to the right hand side of the page. The two terms are in contrasting colors contained in a "grid design of broken lines." The term "Ziff Davis Media" appears above the word "CIO." Perlman testified that despite minor changes in color of both the grid design and the colors of the title, Ziff Davis intends to use this font and layout for the magazine consistently. Figure C is an example of the logo found on the cover of the magazine:

**ZIFF DAVIS MEDIA**

# CIO | INSIGHT™

## Figure C

Further, the logo for Ziff Davis appears on the front of the cover next to the tag line, "Best Practices for IT Business Leaders."

According to IDG, Ziff Davis began advertising its new publication in early February, 2001. Levy stated that "shortly after announcing its new magazine, Ziff Davis (through a subsidiary) attempted to purchase the subscriber list for 'CIO' magazine from IDG." IDG rejected the request. Nonetheless, Ziff Davis began to solicit potential customers through electronic and print direct mailings. Ziff Davis did not include its name on the solicitations, opting instead to advertise simply with the title of the magazine. Both the electronic and print solicitations contained the following text:

> As a senior-level technology executive, you are entitled to receive CIO Insight—The new publication devoted to IT strategists—entirely FREE—as a professional courtesy.

> Delivering proprietary research, in-depth analysis, expert roundtables, and more, CIO Insight will quickly become your most important technology resource. To apply for your complimentary subscription, simply go on-line to:

> http://subscribe.cioinsight.com

The page contains a survey and a form with biographical questions for potential customers. Although IDG contends that the click through web page did not include identification about the publisher of the new magazine, at present, Ziff Davis's name, the logo for the magazine, and the tag line, "Best Practice for IT Business Leaders" appear at the top of the registration form.

### C. Confusion

IDG has identified certain examples of public confusion. According to IDG, two trade journals confused CIO Insider and CIO Insight. In the February 1, 2001 electronic issue and the February 5, 2001, print issue of *B to B Magazine*, a journal covering marketing and the business to business sector, Ziff Davis's new publication was referred to as both "CIO Insight" and "CIO Insider." Later, in the March 5, 2001 issue of "Min Magazine," an article referred to the pending lawsuit and stated, "IDG is suing to block Ziff Davis's May debut of *CIO Insider* (circ.50,000), which CIO publisher IDG claims will 'irreparably' damage its senior level IT exec brand." (emphasis added).

In addition to the confusion in the trade press, IDG has identified five examples of consumer confusion and six examples of advertiser confusion. In these specific examples, the reader or the advertiser contacted IDG in an attempt to subscribe to or advertise in CIO Insight.

## II. DISCUSSION

■ A preliminary injunction is appropriate where the moving party can demon-

strate (1) a reasonable probability of success on the merits; (2) irreparable injury to the moving party if the court denies the injunction; (3) lesser irreparable harm to the non-moving party if the court grants the injunction; and (4) that the public interest favors issuing the injunction. *See Doe v. National Bd. of Med. Exam'rs*, 199 F.3d 146, 154 (3d Cir.1999); *American Civil Liberties Union of New Jersey v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc). At this stage of the proceeding, IDG is only asserting its claims of federal trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114;[2] federal unfair competition under § 43 of the Lanham Act, 15 U.S.C. § 1125;[3] and common law unfair competition as to its CIO Insider newsletter.

### A. *Success on the Merits*

■ The Lanham Act makes actionable "the deceptive and misleading use of marks" and protects "persons engaged in ... commerce against unfair competition." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505

U.S. 763 767–68, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (quoting § 45 of the Lanham Act, 15 U.S.C. § 1127). To succeed on the merits of a federal trademark infringement or unfair competition case, IDG must prove that (1) CIO Insider is a valid and protectable mark; (2) it owns the mark; and (3) Ziff Davis's use of CIO Insight to identify its goods or services causes a likelihood of confusion with CIO Insider. *See A & H Sportswear v. Victoria's Secret Stores*, 237 F.3d 198, 210 (3d Cir.2000).

The parties contest the validity of the mark and whether individuals are likely to be confused by Ziff Davis's use of CIO Insider. However, the parties do not dispute that IDG owns the CIO Insider mark. Therefore, at this stage of the proceeding, the court will not consider the second prong of the analysis.

### 1. *Is CIO Insider a Valid and Protectable Mark?*

■ Marks that are federally registered and have become "incontestable"[4]

---

**2.** Section 32(1) of the Lanham Act states in relevant part:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)

**3.** Section 43(a) of the Lanham Act, which governs unfair competition claims, states in relevant part:

Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or mislead-

ing description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

**4.** "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that is has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 472 n. 7 (3d Cir.1994). Subject to certain exceptions, an incontesta-

under 15 U.S.C. §§ 1058 and 1065 meet the first and second prongs of the standard. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991). Where a mark is not federally registered or is contestable, it may receive protection if the public recognizes the mark as distinguishing one company's goods from another's. *See id.* at 291–92; *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986). Courts classify marks along a spectrum of increasing distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful. *See Two Pesos, Inc.*, 505 U.S. at 768, 112 S.Ct. 2753; 15 U.S.C. § 1052. Generic marks "function as the common descriptive name of a product class." *A.J. Canfield Co.*, 808 F.2d at 296. Descriptive marks "describe a characteristic or ingredient of the article to which it refers." *Id.* Suggestive marks are commonly used words that "suggest rather than describe the characteristics of the goods," but require some imagination, thought, and perception to discern the good or service on which the mark is placed. *Id.* Arbitrary marks are also words in common usage, "but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality, or characteristic of those goods or services." *Ford Motor Co.*, 930 F.2d at 292 n. 18. Fanciful marks "bear 'no logical or suggestive relation to the actual characteristics of the goods.'" *A.J. Canfield Co.*, 808 F.2d at 296 (quoting *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 n. 8 (1st Cir.1980)).

■ Marks on the distinctive end of the spectrum, those that are suggestive, arbitrary, or fanciful, "are deemed inherently distinctive and are entitled to protection," because "their intrinsic nature serves to identify a particular source of a product." *Two Pesos, Inc.*, 505 U.S. at 768, 112 S.Ct. 2753; *see also Ford Motor Co.*, 930 F.2d at 292. At the other end of the spectrum, generic marks, are not entitled to be registered or receive protection under the Lanham Act "because even complete 'success in securing public identification ... cannot deprive competing manufacturers of the product of the right to call an article by its name.'" *A.J. Canfield Co.*, 808 F.2d at 296 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)). Therefore, "no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise," courts will not protect generic marks. *Abercrombie & Fitch Co.*, 537 F.2d at 9.

■ In the middle are marks that are descriptive. These marks are not inherently distinctive, but can receive protection from a poaching competitor if the mark "has become distinctive of the applicant's goods in commerce." 15 U.S.C. §§ 1052(e),(f); *see also Two Pesos, Inc.*, 505 U.S. at 769, 112 S.Ct. 2753. This distinctiveness is called "secondary meaning." The Third Circuit uses the following non-exclusive factors to determine whether a mark has achieved secondary meaning: "(1) the length or exclusivity of use of the mark; (2) the size or prominence of the plaintiff's enterprise; (3) the existence of substantial advertising by the plaintiff; (4) established place in the market; and (5) proof of intentional copying." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157 165 (3d Cir. 2000)

---

ble mark is conclusive evidence of the exclusive right to use a mark with respect to the goods and services specified in the registra-

tion. IDG does not argue that its CIO Insider mark is incontestable.

With these guidelines in mind, the "general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Id.* The determination of where a mark falls on the scale depends on the context of the marks's use, its time of use, and its group of users. *See 20th Century Wear v. Sanmark–Stardust, Inc.,* 747 F.2d 81, 89–90 (2d Cir.1984).

Ziff Davis contends that CIO Insider is merely a descriptive mark, with little evidence of secondary meaning. According to Ziff Davis, CIO Insider merely describes the actual content of the newsletter, that is, CIO Insider provides subscribers with a guide to what is inside CIO.com and CIO magazine. In support of this, Ziff Davis points to the tag line, "Your Guide to What's New on CIO.com." Further, Ziff Davis argues that CIO Insider has not acquired secondary meaning. Ziff Davis contends that because CIO Insider is more descriptive than distinct, IDG carries a higher burden to establish a secondary meaning. According to Ziff Davis, CIO Insider is merely a promotional device without a distinctive logo, design, or trade dress. Further, Ziff Davis contends CIO Insider has no original content and is not listed as an individual news source on commercial databases dedicated to culling such information like Westlaw.

IDG contends that CIO Insider is either suggestive or descriptive with strong evidence of secondary meaning. In its opening brief in support of its motion for a preliminary injunction, IDG argues that the words "CIO" and "Insider" should not be read simply as describing the content of the e-mail or what is inside CIO.com. Rather, IDG contends that taken together, the words CIO and Insider indicate a person who is knowledgeable about issues important to chief information officers, that is, an insider on issues pertinent to CIOs. In its reply brief, IDG contends that even if CIO Insider is not a suggestive mark, IDG can point to strong evidence that the mark has achieved secondary meaning. Applying the *Times Mirror* factors, first, IDG contends that it has been the exclusive user of the CIO Insider mark in a niche market for over four years. Second, IDG argues that CIO Insider has attained certain prominence within the relevant market and has over 124,000 subscribers to the newsletter. At a publication rate of twice a week, those subscribers represent a viewership of close to 1 million per month. Lastly, IDG argues that it has spent over $3 million directly developing and marketing this product. In addition, IDG has spent $12 million developing CIO magazine and approximately $46.5 million marketing and developing all of its CIO marks.

In light of the principles announced by the Third Circuit and considering the procedural posture of this case, the court finds that IDG has identified facts that demonstrate a reasonable probability of success of proving that CIO Insider is a valid and protectable mark. That is, IDG has a reasonable probability of success of proving that CIO Insider is a descriptive mark that has achieved a sufficient degree of secondary meaning to receive trademark protection.

### 2. *Are customers likely to confuse CIO Insider and CIO Insight?*

A likelihood of confusion exists when "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Dranoff–Perlstein Assocs. v. Sklar,* 967 F.2d 852, 862 (3d Cir.1992) (quotations omitted); *see*

also *A & H Sportswear, Inc.*, 237 F.3d at 211. When goods in a trademark case compete directly against each other, a court may not need to look beyond the mark to determine whether consumers are likely to be confused. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). When goods compete indirectly or do not compete at all, the Third Circuit developed a non-exhaustive list of factors, called the *Lapp* test or *Lapp* factors, that courts should consider to determine whether there is a likelihood of confusion between marks:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets for the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Id.* at 463; *A & H Sportswear, Inc.*, 237 F.3d at 215. *But see A & H Sportswear, Inc.*, 237 F.3d at 213 ("[T]he *Lapp* factors should be used both for competing and noncompeting goods."). A court does not need to use all of the factors in every case. "[T]he Lapp test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." *A & H Sportswear, Inc.*, 237 F.3d at 215.

As a preliminary matter, the court finds that CIO Insider and CIO Insight do not compete against each other directly. Ziff Davis may have created CIO Insight in an effort to compete against a family of IDG's products and services which are geared toward information systems professionals. However, a content-rich, self-contained, print magazine does not compete directly with an electronic newsletter with headlines and hyper-links to more content on CIO.com.

■ The court will proceed to apply the *Lapp* factors to the present case. In applying these factors, the court will only consider the marks at issue on this motion for preliminary injunction: IDG's electronic newsletter, CIO Insider, and Ziff Davis's print magazine, CIO Insight.

### a. *Similarity of the marks*

■■ The test for similarity between two marks is "whether the labels create the same overall impression when viewed separately." *A & H Sportswear, Inc.*, 237 F.3d at 216 (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 (3d Cir.1994)). The marks are confusingly similar "if ordinary consumers would likely conclude that [the underlying products] share a common source, affiliation, connection or sponsorship." *Fisons Horticulture, Inc.*, 30 F.3d at 476. If consumers do not typically view the products side-by-side in the normal channels of commerce,

courts should not compare the products directly, but should make an effort "to move into the mind of the roving consumer." *A & H Sportswear, Inc.*, 237 F.3d at 216.

IDG contends that the marks share visual and auditory characteristics. In support of this, IDG notes that the first portion of each mark is the term "CIO" followed by the same *four* letters that make up the same two syllables "In" and "si." Further, both Insight and Insider are pronounced with a long vowel sound in the second syllable. IDG argues that these similarities suggest that Ziff Davis intends to confuse consumers as it enters a market dominated by the IDG's products.

In response, Ziff Davis notes that while it intended to compete with CIO magazine, it did not choose the name CIO Insight in an effort to compete with the electronic newsletter. According to Ziff Davis, the differences in trade dress between the two products almost precludes this comparison. That is, because CIO Insider is an electronic newsletter and CIO Insight is a print magazine, consumers will not view the two products as similar or connected. Further, Ziff Davis contends that the logo for CIO Insight indicates a dissimilarity between the two products.

The court finds that although the marks are comparable in sound and meaning, the look and overall commercial impression of the marks is not similar. First, the initial term of both marks, "CIO," and the opening syllables of "Insider" and "Insight" sound alike. Further, both marks imply a common meaning. Although the definitions of "Insider" and "Insight" are distinct, the titles convey the impression that a reader may find information within the publication important to information systems professionals. Nevertheless, visually the marks are quite distinct. CIO Insider

arrives via e-mail in standard type. There is no graphic or logo associated with the newsletter. Subscribers can identify the newsletter by the title of the email: CIO Insider. In contrast, Ziff Davis has produced a magazine with a graphic logo and distinct look. As Perlman noted, the "title appears in a distinctive logo design in which the terms 'CIO' and 'Insight' appear in contrasting colors with greater prominence given to 'Insight;'" "the title is placed flush to the right-hand margin," and in an effort to "brand the magazine as a Ziff Davis publication, 'Ziff Davis Media' appears directly above the" CIO Insight title. Further, Perlman testified that Ziff Davis intends to stay away from the colors red, white, and black for the title of CIO Insight in an effort to distinguish itself from the logo for CIO magazine, CIO.com, and other related products.

Moreover, the overall commercial impression is distinct. As Ziff Davis argued, CIO Insider is an electronic mailing that does not contain its own content. Rather, the newsletter contains links that refer the reader to articles or information on CIO. com. In contrast, CIO Insight is intended as a content-rich, eighty-page, print magazine.

In summary, the court finds that although there are some similarities between the marks at issue in terms of sound and meaning, the look of the logo and the trade dress distinguish CIO Insight from CIO Insider. Thus, the court finds that this factor weighs against finding a likelihood of confusion.

b. *Strength of the marks*

██ In evaluating the strength of a mark, a court should consider the distinctiveness or conceptual strength of the mark and the commercial strength or marketplace recognition of the mark. *See Fisons Horticulture, Inc.*, 30 F.3d at 479.

As noted above, the court finds that IDG can point to evidence to support a finding that CIO Insider is a descriptive mark with evidence of secondary meaning. Ziff Davis argues that even if the mark deserves some protection, CIO Insider is a weak mark because the term "CIO" is an acronym for the target audience and "Insider" is a commonly used term in publications for niche markets. Ziff Davis identifies numerous examples of other publications that incorporate the term "CIO" in titles of print publications, web sites, and electronic newsletters. For example, CMP Media, a competitor of IDG, owns two registrations for "Secret CIO," one for a magazine column and one for a website. Further, Ziff Davis identified a number of uses of the term CIO in electronic newsletters including: "The Cynical CIO," "CIO Information in the News," "CIO Digest," "CIO Monthly Forum," "CIO Update," and "Ask the Secret CIO." Further, Ziff Davis has identified over ninety federal trademark applications and registrations of marks that use the term "Insider" in connection with magazines, newsletters, and columns by companies other than IDG. Among the registrations and applications are "Internet Insider," "Wireless Insider," "The Chip Insider," "The Financial Insider," "Managed Care Insider," and "Video Insider." Ziff Davis has also identified widespread common-law use of the term "Insider" in publication titles including: "Computer Insider," "Online Insider," "Aftermarket Insider," "Trade Dimensions Insider," "Real Estate Broker's Insider," "Business Insider," and "Star Wars Insider."

The court agrees with Ziff Davis's arguments. Thus, while the mark deserves protection under the Lanham Act, it is on the low end of the spectrum of marks that courts should protect. *See Express Servs., Inc. v. Careers Express Staffing Servs.,* 176 F.3d 183, 186 (3d Cir.1999) (noting that classification of distinctiveness is useful in determining the conceptual strength of a mark).

Nonetheless, IDG argues that CIO Insider has commercial strength and marketplace recognition. First, IDG contends it has spent considerable sums developing recognition of the mark in a niche market. In evaluating these sums, IDG argues that the court should consider the $3 million spent directly on developing CIO Insider relative to the size of this niche market. Further, according to IDG, the strength and value of CIO Insider is increased by its association with CIO.com and CIO magazine. IDG believes that because of this association, the court should consider the $46.5 million spent developing CIO-related marks, the circulation of CIO magazine, and the number of hits on CIO.com.

Despite these direct and indirect expenditures, the court finds that IDG likely cannot show that CIO Insider has high marketplace recognition independent of CIO.com or CIO magazine. That is, although IDG can demonstrate that the newsletter is sent close to 1 million times per month, at this point in the proceedings, IDG has not shown whether consumers consider the newsletter a separate publication or a marketing piece of IDG's other offerings. Thus, the court cannot find that CIO Insider, even in the niche market identified, has a high level of commercial strength.

Therefore, the court finds that this factor weighs against finding a likelihood of confusion.

c. *Price similarity*

In analyzing the third factor, courts must determine whether the price or importance of a product will impact a consumer's attention to the brand purchased. IDG provides CIO Insider free of charge

to anyone who signs up for it. Further, although not at issue in the motion for preliminary injunction, IDG provides CIO magazine to approximately 96% of its subscribers free of charge. IDG contends that because Ziff Davis is offering "free charter subscriptions" in electronic solicitations and in direct mailings that, at the outset, do not mention that Ziff Davis is the publisher, consumers will be confused by the products. That is, even if the subscriber form now has the logo for CIO Insight that includes the name Ziff Davis Media, consumers will be confused by the original solicitation that does not reference the defendant. IDG argues that the similarity of form between Ziff Davis's electronic advertising and CIO Insider suggests likelihood of confusion.

Defendant contends that consumers in this niche market are sophisticated purchasers who can easily distinguish between the parties' technology magazines and services. Further, since both companies primarily generate revenue from advertising, Ziff Davis argues that the court should consider whether advertisers are confused by the two products. Ziff Davis contends that most advertising sales are done face-to-face and advertisers can discern the difference between the two products.

First, the court notes that advertisers may be a relevant market to consider in analyzing this factor. However, because the parties have not identified evidence about the price of advertising or the channels of selling the advertising, the court will not consider whether advertisers are confused by the products. Second, as both products are free of charge to end consumers and as Ziff Davis has promoted its print magazine through electronic mailings, the court finds that IDG may demonstrate at trial that consumers do not pay strict attention to the differences between these products. Thus, the court will weigh this factor in favor of finding a likelihood of confusion.

### d. *Defendant's use of the mark and actual confusion*

The fourth factor concerns the length of time a defendant has used the mark without actual confusion arising. The sixth factor concerns whether a plaintiff can show that consumers have actually been confused by the marks. Because these factors are intrinsically related, the court will consider them together.

IDG contends that the first instance of actual confusion arose within four days of Ziff Davis publicly using the CIO Insight mark. IDG concedes that at this point in the case it has only identified isolated examples of consumer and advertiser confusion and two instances of confusion in the trade press. Nonetheless, it argues that given the short amount of time that Ziff Davis has been using the CIO Insight mark, this is sufficient evidence of confusion for the court to weigh this factor in favor of granting an injunction.

Ziff Davis contends that the trade press mistakes are irrelevant because the courts should only consider consumer confusion. Further, Ziff Davis contends that isolated examples of consumer and advertiser confusion are not enough to grant a preliminary injunction.

Although IDG has identified some examples of confusion among the target audience for the publications, on a motion for preliminary injunction, the court does not find that confusion is attributable to any similarity between the marks. As the parties agree, Ziff Davis is competing in a market presently dominated by the IDG. It is possible that consumers and advertisers would associate any publication in this market, regardless of the title, with IDG's products and services. As the Third Circuit stated, "ownership of a trademark

does not guarantee total absence of confusion in the marketplace. Selection of the mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978). In this case, given the descriptive nature of the core portion of IDG's marks, the term "CIO," IDG must expect some confusion in the marketplace as competitors enter and introduce products. This does not preclude IDG from later introducing evidence, such as survey data, that demonstrates actual confusion of consumers or advertisers.

Nonetheless, given the evidence plaintiff has identified, although scant, the court does not believe that these factors militate in favor of the defendant. Therefore, the court will consider these factors neutrally weighted. That is, these factors do not tip the scales for or against a finding of a likelihood of confusion.

### e. *Intent of the defendant*

In analyzing the fifth *Lapp* factor, the court must determine the intent of the defendant in adopting the mark. A "defendant's bare intent to adopt a mark" is not probative of a likelihood of confusion "since there is little basis in fact or logic for supposing from a defendant's intent to copy (without more) that the defendant's actions will in fact result in confusion." *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 205 (3d Cir.1995). However, a "defendant's intent will indicate a likelihood of confusion . . . if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *A & H Sportswear, Inc.*, 237 F.3d at 225–26. IDG contends that several factors support a conclusion that Ziff Davis intended to copy the CIO Insider mark and confuse consumers: first, Ziff

Davis was aware of the CIO Insider mark when it began to publicize CIO Insight; second, Ziff Davis attempted to purchase IDG's subscriber lists in order to promote CIO Insight; and third, Ziff Davis intended to compete against IDG's products.

Ziff Davis contends that it acted in good faith in choosing and promoting its mark. Although Ziff Davis concedes that it attempted to compete against CIO magazine, it argues that it wanted to compete legitimately in the marketplace. In an effort to avoid infringement, Ziff Davis hired a trademark search firm to research the availability of CIO Insight and developed a distinct logo and unique trade dress for its magazine.

Ziff Davis clearly knew about CIO magazine at the nascent stages of CIO Insight and may have known about CIO Insider when it publicized its new product, but this is not enough to demonstrate bad faith or an intent to confuse. Ziff Davis researched the availability of the mark and intended to compete with an established product. As the Third Circuit noted, "copying, absent an intent to confuse, might do no more than signal to potential consumers that the junior user's product is in direct competition with the senior user's product. Such copying might thus serve a valuable communicative function." *Id.* at 226 n. 16. The court finds that, at this point in the proceeding, IDG has not shown that Ziff Davis has acted in bad faith or with the intent to confuse consumers. Therefore, the court will not weigh this factor in favor of finding a likelihood of confusion.

### f. *Marketing channels*

In analyzing the seventh factor, the court must consider whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media. IDG

contends that Ziff Davis "is sending electronic advertisements—e-mail solicitations—and mailings to potential consumers for 'free charter subscriptions to CIO Insight.' " Further, according to IDG, Ziff Davis has marketed its new magazine in the trade press. IDG contends that these are the same channels used to promote CIO Insider, CIO magazine, and CIO.com. The court agrees. It is likely that IDG can establish at trial that both parties are using highly targeted niche marketing—in electronic, print, and trade press form—to solicit potential customers. Thus, the court finds that this factor militates in favor of a finding of a likelihood of confusion.

### g. Marketing targets

Under the eighth *Lapp* factor, a court must consider whether the targets for the parties' sales efforts are the same. IDG contends that both products are marketed to chief information officers and other senior corporate executives interested in information technology. As further evidence of this, Levy testified that Ziff Davis attempted to purchase IDG's subscriber list on February 5, 2001. Ziff Davis concedes that both CIO Insight and CIO Insider are targeted towards information systems professionals, however, it contends that "IDG's e-mail is sent to a closed circle of current CIO/CIO.com subscribers while Ziff Davis is broadly marketing its magazine throughout the nation."

The court finds that IDG has a reasonable probability of demonstrating that the targets of the parties' sales efforts are the same. First, both parties agree that the target audience for both products is the same. Second, IDG identified sufficient facts to suggest that its newsletter is not restricted to a closed circle of subscribers. At oral argument, IDG's attorney stated that only 40% of CIO Insider subscribers

also receive CIO magazine. Further, anyone who visits CIO.com may sign up for its newsletter. Thus, the court will weigh this factor in favor of a finding of a likelihood of confusion.

### h. Relationship of the goods in the minds of the consumers

In considering the ninth of the *Lapp* factors, the court must determine whether consumers will conflate the marks because of the of the products' similarity of function. IDG contends that although the medium of delivery and the frequency of publication is different for CIO Insider and CIO Insight, the products serve the same function. IDG argues, "given the nature of this market, consumers would have every reason to expect that the source of 'CIO' and 'CIO Insider' would also be producing 'CIO Insight' or, conversely, that the publishers of 'CIO Insight' would distribute a newsletter under the title 'CIO Insider.' "

As discussed above, the court finds that Ziff Davis can demonstrate that the overall commercial impression of the two products is distinct. Moreover, as stated above, IDG cannot reasonably expect that no confusion will exist between the two products. IDG has picked a title for its magazine and its newsletter that has at its core a description of the target audience. Further, Ziff Davis has placed its name above the logo for CIO Insight. Even if some consumers do not know which company publishes CIO Insider or CIO magazine, or may associate the products and conflate the marks, the court finds that this factor should not be weighted in favor a finding of a likelihood of confusion.

### i. Other Factors

In the last *Lapp* factor, the court must consider other facts that suggest the consuming public might expect IDG to manu-

facture a product in the defendant's market, or that IDG is likely to expand into that market. Here, IDG already competes in the same market as Ziff Davis with CIO magazine. This suggests that consumers may confuse CIO magazine and CIO Insight. As stated above, Ziff Davis has placed its name above the logo for CIO Insight, thus, mitigating some of the potential confusion. Despite this, the court finds that the potential confusion between print magazines weighs in favor of a finding of a likelihood of confusion.

### j. *Summary*

Although several factors militate in favor of finding a likelihood of confusion, overall the court finds that the plaintiff has not met its burden of establishing a reasonable probability of success on the merits. In balancing the factors, the court has not mechanically counted whether more factors militate in favor of or against the finding. Rather, in reaching its decision, the court has accorded the factors different weights in accordance with the particular facts of this case. *See A & H Sportswear, Inc.,* 237 F.3d at 215. The court finds that, in light of the relative strength of the mark and the distinction in trade dress between the products, IDG has not met its burden to show a likelihood of actual or direct confusion.

### 3. *Is there evidence of reverse confusion?*

■■■ Reverse confusion exists where a junior user of a mark free rides on the reputation and good will of the senior user by adopting a similar or identical mark. *See A & H Sportswear, Inc.,* 237 F.3d at 228; *Fisons Horticulture, Inc.,* 30 F.3d at 474–75. Reverse confusion "occurs when the junior user saturates the market with a similar trademark and overwhelms the senior user." *Fisons Horticulture, Inc.,*

30 F.3d at 474–75 (quoting *Ameritech, Inc. v. American Info. Techs. Corp.,* 811 F.2d 960, 964 (6th Cir.1987)). In considering these claims, courts should consider factors similar to those elucidated in *Lapp* for cases of direct confusion. *See A & H Sportswear, Inc.,* 237 F.3d at 234. The Third Circuit made two changes to the Lapp factors. First, in evaluating the strength of the marks, courts must weigh "both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior's favor." *Id.* Second, courts should consider "other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market." *Id.*

Considering these minor changes to the *Lapp* factors and, in light of the analysis above, the court finds that plaintiff has not shown a reasonable probability of success in proving reverse confusion.

### 4. *Summary of success on the merits*

Although IDG has established that CIO Insider is likely a valid and protectable mark, it has not shown a reasonable probability of success in proving direct or reverse confusion. This failure militates against issuing a preliminary injunction.

### B. *Irreparable Injury*

■■■ The second factor the court must consider in determining whether to issue a preliminary injunction is whether denying the requested relief will cause the moving party irreparable injury. When a trademark is infringed, the mark's owner suffers irreparable injury because of the loss of the ability to control its reputation, the potential loss of trade, and loss of goodwill. *See S & R Corp. v. Jiffy Lube*

 

*Int'l, Inc.,* 968 F.2d 371, 378–79 (3d Cir. 1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 196 (3d Cir.1990). Irreparable injury can also be based on consumer confusion. *See S & R Corp.,* 968 F.2d at 379. Lastly, "trademark infringement amounts to irreparable injury as a matter of law." *Id.* Thus, the court finds that IDG has shown that it will suffer irreparable injury if it is shown that Ziff Davis infringed the CIO Insider mark.

### C. *Irreparable Injury to Non–Moving Party*

The third factor for a court to consider in determining whether to issue a preliminary injunction, is whether the non-moving party will be irreparably injured by the grant of injunctive relief. In this case, Ziff Davis has already invested millions of dollars in anticipation of launching its premier publication in May, 2001. Forcing a name change will cause monetary damage as Ziff Davis necessarily delays its premier to change the cover and title and build up a market presence for a new title. Further, Ziff Davis could incur reprint costs and lost advertising revenue. This damage, however, is not irreparable. Ziff Davis could be compensated for these losses. More troubling to the court is the potential that Ziff Davis's reputation in the marketplace will be damaged if readers and advertisers have to wait for the initial issue of CIO Insight. These damages can constitute irreparable injury. In balancing the hardships, the court finds that given the plaintiff's failure to demonstrate a likelihood of success on the merits, Ziff Davis's injury would be greater if the court granted injunctive relief.

### D. *Public Interest*

The final consideration in this analysis is whether the issuance of a preliminary injunction furthers the public interest. IDG argues that the public has a right not to be confused or deceived by infringing marks. In opposition, Ziff Davis contends that since IDG has failed to demonstrate a likelihood of success on the merits, it is in the public interest to allow CIO Insight to compete freely in the marketplace. The court agrees. Where, as here, plaintiff has not shown that it will likely succeed on the merits, the public's interest is not served by taking a competitive and valuable product out of the marketplace.

### III. *CONCLUSION*

For the reasons stated above, the court finds that IDG has not met the requirements for parties seeking a preliminary injunction. Thus, the court will deny IDG's motion. The court will enter an order consistent with this opinion.